[No. G001589. Fourth Dist., Div. Three. July 31, 1985.]

JOHN DAVID HIGGASON, Petitioner, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

COUNSEL

Ronald Y. Butler, Public Defender, Frank Scanlon, Assistant Public Defender, James Dean Allen and MacDonald Becket, Jr., Deputy Public Defenders, for Petitioner.

No appearance for Respondent.

Cecil Hicks, District Attorney, Michael R. Capizzi, Assistant District Attorney, William W. Bedsworth and Craig McKinnon, Deputy District Attorneys, for Real Party in Interest.

OPINION

**SONENSHINE, Acting P. J.**—Petitioner John David Higgason seeks an extraordinary writ (Pen. Code, § 999a) to compel the dismissal of a felony information charging him with possession of cocaine for the purpose of sale (Health & Saf. Code, § 11351). He argues cocaine seized under the authority of a search warrant should be suppressed.

The search warrant affidavit was executed by an experienced narcotics investigator. He relied on information supplied by three anonymous telephone calls and a followup investigation.

The first telephone call was received by the "WE TIP" organization during the early evening on September 21, 1983. The caller said David Higgason was selling cocaine and marijuana from the residence he occupied with his 15-year-old son, Robert, and a 12-year-old daughter. Higgason's vehicles were described—an older model blue and white Lincoln and a new Toyota or Datsun "4×4" pickup truck. It was said Higgason picked up the drugs in Tijuana, Mexico. Higgason was further "reported to be the manager of the apartment building . . . ." The caller claimed firsthand knowledge of the illegal activity, saying it had been going on for approximately six months.

The next afternoon the affiant received a telephone call in his office at the police department. The caller was a man whose voice sounded like that of a person 50 to 60 years old. The affidavit states this caller gave the same information about marijuana and cocaine dealing as the "WE TIP" call of the previous day. The second caller gave the same residence address for Higgason, but said his first name was "John." The caller also described Higgason as 40 to 41 years old, 5 feet 10 inches to 5 feet 11 inches, medium

build and brown hair. The affidavit states, "[t]his is substantially the same description as given to 'WE TIP' by their anonymous caller."

The caller claimed Higgason's teenage son was beginning to sell drugs supplied by his father. There was foot traffic in and out of Higgason's apartment day and night, particularly on weekends. The caller said Higgason had a heavy iron gate at the top of the stairway to his apartment; a guest had to be "buzzed in" before he or she could reach the front door. According to the affidavit, "[i]t was reported . . . this gate was installed by Higgason to prevent unknown subjects from gaining access to his front door and to keep the police from gaining entry, giving him time to dispose of his drugs."

This caller denied calling "WE TIP" the previous day. He was calling because he did not want young people to get involved in drug selling. He had used marijuana some 10 years before, when it was not "fashionable," but came to believe drug use was wrong. The caller also said Higgason kept marijuana and cocaine in his bedroom and this informant had seen, within that past week, several baggies of marijuana and bindles of white powder Higgason said was cocaine. The caller described the quantities of these drugs in which Higgason dealt. This informant wished to remain anonymous.

On September 26, 1983, the affiant drove to the apartment described as Higgason's residence. There was a late model Datsun pickup truck with no license plates in the driveway, as well as a 1972 Lincoln "blue/white in color," registered to John David Higgason, parked in front. The affiant saw an iron gate at the top of the stairway to apartment No. 3. A Department of Motor Vehicles record check revealed the following description of John David Higgason: male, white, 5 feet 11 inches, 170 pounds, brown hair, brown eyes, born on July 20, 1943. The affiant ran utility checks of the apartment and found them to be in the name of John Higgason.

During the morning of October 3, 1983, the affiant received another telephone call. The caller refused to identify herself, but the affiant believed the caller to be young and female. She said John Higgason and his teenage son were selling marijuana from their residence. Her boyfriend was buying marijuana from Higgason and she was tired of him spending all his money on drugs and "getting 'loaded' all the time. She stated she wanted her boyfriend's connection 'busted' and refused to supply anything additional, hanging up."

Based on this information, the affiant offered an expert opinion there was marijuana and cocaine, as well as other evidence of drug dealing, in the

apartment. On October 5, 1983, a magistrate issued the search warrant and the police served it the next day. They recovered the contraband which led to the instant prosecution. Higgason's motion to quash the search warrant was denied by the preliminary hearing magistrate, as was his motion to set aside the information in superior court (Pen. Code, § 995). Higgason seeks an extraordinary writ to compel dismissal of the charge.

## I

■ Recently, the California Supreme Court concluded article I, section 28, subdivision (d) of the state Constitution, the "Truth-in-Evidence" provision of the Victim's Bill of Rights (Prop. 8), abrogates "a defendant's right to object to and suppress evidence seized in violation of the California, but not the federal, Constitution." (*In re Lance W.* (1985) 37 Cal.3d 873, 879 [210 Cal.Rptr. 631, 694 P.2d 744].) ■ From the outset, Higgason has argued the search warrant at issue is insufficient even under the relaxed federal constitutional guidelines enunciated by the United States Supreme Court in *Illinois* v. *Gates* (1983) 462 U.S. 213 [76 L.Ed.2d 527, 103 S.Ct. 2317]. He is correct.

In *Gates,* the court decided "it is wiser to abandon the 'two-pronged test' established by . . . *Aguilar* and *Spinelli* . . . [and] reaffirm the totality-of-the-circumstances analysis that traditionally has informed probable-cause determinations. [Citations.] The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . ., including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed. [Citation.]" (*Illinois* v. *Gates, supra,* 462 U.S. 213, 238 [76 L.Ed.2d 527, 548, 103 S.Ct. 2317, 2332], fn. omitted.)

■ At the same time, the court took care to indicate flexibility, not laxity, is the proper approach when reviewing a warrant's sufficiency. "In order to ensure . . . an abdication of the magistrate's duty does not occur, courts must continue to conscientiously review the sufficiency of affidavits on which warrants are issued. But when we move beyond . . . 'bare bones' affidavits . . ., this area simply does not lend itself to a prescribed set of rules, like that which had developed from *Spinelli*. Instead, [a] flexible, common-sense standard . . . better serves the purposes of the Fourth Amendment's probable-cause requirement." (*Illinois* v. *Gates, supra,* 462 U.S. 213, 239 [76 L.Ed.2d 527, 549, 103 S.Ct. 2317, 2332-2333].) "Although *Gates* rejected the rigid application of the *Aguilar-Spinelli* 'two-

pronged' test, the factors considered in that test remain highly relevant to the probable cause determination. [Citation.]" (*United States* v. *Estrada* (9th Cir. 1984) 733 F.2d 683, 685.)

The facts of *Gates* and the court's analysis of them are helpful in resolving the present case. The police received an anonymous letter describing in some detail the manner in which Susan and Lance Gates shuttled drugs between Florida and Illinois. It also predicted such a shuttle on May 3.[1] Surveillance by several law enforcement agencies revealed, as predicted, a trip by the Gates.

The court upheld the search warrant. As the phrase "totality of the circumstances" implies, the issues of "veracity," "reliability," and "basis of knowledge" are closely intertwined in making a probable cause determination. (See *Illinois* v. *Gates, supra,* 462 U.S. 213, 230 [76 L.Ed.2d 527, 543, 103 S.Ct. 2317, 2327-2328].) " '[V]eracity,' 'reliability,' and 'basis of knowledge' are weighed together with any other evidence that supports the finding of probable cause. They are viewed cumulatively, not as independent links in a chain. [Citation.]" (*United States* v. *Estrada, supra,* 733 F.2d 683, 685-686.)

▇ Strong reliance was placed on the corroborative investigation by the police. "Our decisions applying the totality-of-the-circumstances analysis . . . have consistently recognized the value of *corroboration* of details of an informant's tip by *independent police work.* In *Jones* v. *United States* [1960] 362 U.S. [257] at 269, we held that an affidavit relying on hearsay 'is not to be deemed insufficient on that score, so long as a *substantial basis* for crediting the hearsay is presented.' We went on to say that even in making a warrantless arrest an officer 'may rely upon information received through an informant, rather than upon his direct observations, so long as the informant's statement is *reasonably corroborated by other matters within the officer's knowledge.*' [Citation.]" (*Illinois* v. *Gates, supra,* 462 U.S. 213, 241-242 [76 L.Ed.2d 527, 550, 103 S.Ct. 2317, 2334], italics added.)

The court found the law enforcement surveillance of the Gates substantially corroborated the anonymous letter. (See also *Draper* v. *United States* (1959) 358 U.S. 307 [3 L.Ed.2d 327, 79 S.Ct. 329].) The corroboration need not itself be criminal to be adequate. "In making a determination of probable cause the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of non-criminal acts." (*Illinois* v. *Gates, supra,* 462 U.S. 213, 244, fn. 13 [76 L.Ed.2d 527, 552, 103 S.Ct. 2317, 2335].) At the same time,

[1] The police received the letter on May 3.

this passage cannot be divorced from the court's closing discussion about the specific showing in *Gates*. "[T]he anonymous letter contained a range of details relating *not just to easily obtained facts and conditions existing at the time of the tip,* but to future actions of third parties ordinarily not easily predicted." (*Id.,* at p. 245 [76 L.Ed.2d at p. 552, 103 S.Ct. at p. 2335], italics added.)

■ The affidavit at issue here is fatally flawed when judged by the standards enunciated in *Gates*. There are two major deficiencies—*all* the incriminating evidence emanated from *anonymous* sources *and* the police investigation revealed *only* "easily obtained facts and conditions existing at the time of the tip."

As *Gates* demonstrates, anonymous information may ultimately prove reliable, but three anonymous telephone calls, without more, cannot serve to corroborate one another. As the California Supreme Court has noted, quoting *Ovalle* v. *Superior Court* (1962) 202 Cal.App.2d 760, 763 [21 Cal.Rptr. 385], " '[t]he quantification of the information does not necessarily improve its quality; the information does not rise above its doubtful source because there is more of it.' " (*People* v. *Fein* (1971) 4 Cal.3d 747, 753 [94 Cal.Rptr. 607, 484 P.2d 583].) In the final analysis, it is impossible to show different pieces of anonymous information emanated from *independent* sources and are *truly* corroborative of one another. (See *ibid.*) Granted, the calls here appear to have been made by at least two people, one older and male, the other younger and female. In addition, the male denied making the "WE TIP" call. But it nonetheless is impossible to say with reasonable certainty any of these calls was truly independent of either of the others. For this reason, the quantity does not improve the quality.

■ The perils of reliance on anonymous informants were recently surveyed in *People* v. *Kershaw* (1983) 147 Cal.App.3d 750 [195 Cal.Rptr. 311]. "In the case of confidential citizen informers, the mere fact that they make their identity known to the police is, itself, some indication of their honesty. [Citation.] A further indication of reliability is that by identifying themselves to the police they expose themselves to potential liability for malicious prosecution or false reporting of a crime if their information proves to be false. [Citation.] Furthermore, by identifying themselves, these citizen informers afford the police the opportunity to check on matters affecting their credibility such as the existence of a criminal record and whether they had previously supplied information to the police. [¶] In contrast, information from anonymous sources is inherently unreliable. Neither the police nor the magistrate knows the motives of the unknown informant. Here the informer may have been motivated by concern for the welfare of a relative as he/she claimed to be [citation] or may have been perpetrating

a hoax on the police or seeking revenge on a neighbor [citation]. In addition, the police and the magistrate cannot possibly know how the informant obtained the information [citation]. Nor can they obtain additional information to check out the informer's credibility. Without knowing the identity of the source, the police cannot even determine whether he or she is a criminal, a drug addict, a 'stoolie' or an otherwise inherently unreliable individual. Moreover, where the anonymous information comes over the telephone, as it did here, the police have no opportunity to observe the informer's demeanor while relating the information. Thus, they are deprived of an important facet to the determination of a witness' credibility. [Citation.] We note that decisions of California courts and the United States Supreme Court appear to be unanimous in rejecting anonymous tips, standing alone, as the basis for a search warrant. [Citations.]" (*Id.,* at pp. 756-757, fn. omitted.)[2]

Thus, even under *Gates,* "an anonymous tip needs corroboration before a search warrant can issue." (*People* v. *Kershaw, supra,* 147 Cal.App.3d 750, 757, fn. 4.) As has also been noted, a citizen who purports to be a victim of a crime, and *identifies* himself or herself as such, "may expect to be called to testify after an arrest, and may be exposing himself [or herself] to an action for malicious prosecution if he [or she] makes unfounded charges . . . ." (*People* v. *Hogan* (1969) 71 Cal.2d 888, 891 [80 Cal.Rptr. 28, 457 P.2d 868].) "And although the passage referring to the anonymous informer is dictum in *Hogan* it is nevertheless indicative of the Supreme Court's attitude toward anonymous informers." (*People* v. *Abbott* (1970) 3 Cal.App.3d 966, 971 [84 Cal.Rptr. 40].) "There is no way to determine whether an anonymous informer is a disinterested citizen, a stool pigeon, or even someone involved in the crime. Thus . . . knowledge of the informer's identity is crucial in determining the reliability of his [or her] information." (*Id.,* at p. 970.) For all the foregoing reasons, the existence of three anonymous telephone calls does not sufficiently enhance the reliability of the information in any of them.

 And the "corroboration" supplied by the independent police investigation in the present case is not the type which passes muster under *Gates.* The details actually corroborated were "easily obtained facts and [then existing] conditions." (See *Illinois* v. *Gates, supra,* 462 U.S. 213, 245 [76 L.Ed.2d 527, 552, 103 S.Ct. 2317, 2335].) In other words, they were not facts to which *any* "degree of suspicion" attached. (See *id.,* at p. 244, fn. 13 [76 L.Ed.2d 527, 552, 103 S.Ct. 2317, 2335].)

---

[2]The People argue, in essence, the fact there are *three* anonymous telephone calls reduces the dangers catalogued in *Kershaw.* That is simply not the case; the concerns created by anonymity are present here with respect to *each call.*

The police verified petitioner's physical description, his residence (coupled with the existence of an iron gate)[3] and his vehicles. The courts take a dim view of the significance of such pedestrian facts. "The People contend that the informants' reliability was corroborated by the fact that certain information furnished by them proved to be correct, such as defendant's first name, his presence at the apartment, and the presence of the blue Mustang. However, in order for corroboration to be adequate, it must pertain to defendant's alleged *criminal* activity; accuracy of information regarding the suspect generally is insufficient. [Citations.]" (*People* v. *Fein, supra,* 4 Cal.3d 747, 752-753.) *Gates* does not challenge this reasoning. The *Gates* court makes much of the fact a prediction of *future activity* was corroborated by law enforcement surveillance. (See also *Draper* v. *United States, supra,* 358 U.S. 307.) There is nothing of the sort here. The facts corroborated by independent police work are not suspicious as that term is used in *Gates*.

*People* v. *Kershaw, supra,* 147 Cal.App.3d 750 provides a useful post-*Gates* contrast. An anonymous telephone call triggered a police investigation. Surveillance revealed suspicious foot traffic in and out of Kershaw's residence. (*People* v. *Kershaw, supra,* at pp. 759-760.)[4] He had also been arrested the previous year for possession of cocaine for sale. (*Id.,* at p. 760.) The affidavit thus demonstrated reliance on the anonymous informant was reasonable.[5]

---

[3]The People make much of the presence of an iron gate. Many security conscious citizens, including burglary prone homeowners, will be surprised to learn this protective measure suggests contraband is secreted in their home. The *presence* of the gate in no way corroborates the anonymous information about the *significance* of the gate. This argument is seductive but circular.

[4]One of the anonymous callers in the present case reported suspicious foot traffic. The affidavit reveals no attempt to confirm this report by surveillance. It is significant the police here, unlike those in *Kershaw,* failed to verify this item of information.

[5]*Massachusetts* v. *Upton* (1984) 466 U.S. 727 [80 L.Ed.2d 721, 104 S.Ct. 2085] is also distinguishable. In *Upton,* a telephone caller wanted to remain anonymous, but th727e police officer recognized her voice and she admitted her identity. The court also noted, "[e]xamined in light of *Gates,* Lt. Beland's affidavit provides a substantial basis for the issuance of the warrant. No single piece of evidence in it is conclusive. But the pieces fit neatly together and, so viewed, support the magistrate's determination that there was 'a fair probability that contraband or evidence of crime' would be found in Upton's motor home. [Citation.] The informant claimed to have seen the stolen goods and gave a description of them which tallied with the items taken in recent burglaries. She knew of the raid on the motel room—which produced evidence connected to those burglaries—and that the room had been reserved by Kelleher. She explained the connection between Kelleher's motel room and the stolen goods in Upton's motor home. And she provided a motive both for her attempt at anonymity—fear of Upton's retaliation—and for furnishing the information—her recent breakup with Upton and her desire 'to burn him.'" (*Massachusetts* v. *Upton, supra,* 466 U.S. 727, 733-734 [80 L.Ed.2d 721, 727-728, 104 S.Ct. 2085, 2088].) As *Gates* notes, each case must be decided on its own facts. There is a crucial distinction between the present case and *Upton* on the issue of anonymity. Further, the pieces do not fit neatly together here

Finding the present affidavit sufficient would endorse the procurement of search warrants based entirely upon *anonymous* sources. For the reasons succinctly catalogued in *People* v. *Kershaw, supra,* 147 Cal.App.3d 750, 756-757, anonymous informants and their information do not command such respect. Furthermore, the independent police work here did not corroborate any suspicious activity.

The totality of the circumstances presented by this affidavit do not show "a fair probability that contraband or evidence of a crime will be found in a particular place." (*Illinois* v. *Gates, supra,* 462 U.S. 213, 238 [76 L.Ed.2d 527, 548, 103˙ S.Ct. 2317, 2332].) "[T]he magistrate had [no] 'substantial basis for . . . conclud[ing]' that probable cause existed. [Citation.]" (*Ibid.*)[6]

## II

As a fallback position, the People argue the good faith exception to the exclusionary rule recognized in *United States* v. *Leon* (1984) 468 U.S. 897 [82 L.Ed.2d 677, 104 S.Ct. 3405]. Even assuming the search warrant is not supported by probable cause, the prosecution contends the evidence seized should not be suppressed.[7]

In light of the holding in *In re Lance W., supra,* 37 Cal.3d 873, 879, *Leon* is to be applied in California. Recently, another division of this court held *Leon* was retroactive. (*People* v. *Helmquist* (1984) 161 Cal.App.3d 609 [207 Cal.Rptr. 718]; see generally *People* v. *Guerra* (1984) 37 Cal.3d 385 [208 Cal.Rptr. 162, 690 P.2d 635].) Even so, there is a serious obstacle to the use of *Leon* here: The People did not argue the good faith exception at the preliminary hearing or the section 995 hearing.

Ordinarily, the People may not argue a new theory supporting the admissibility of evidence for the first time before an appellate court. (*Lorenzana* v. *Superior Court* (1973) 9 Cal.3d 626, 640-641 [108 Cal.Rptr. 585,

---

in a manner supporting the magistrate's determination. The informant in *Upton* knew things about an ongoing police investigation which could obviously be verified. Here, by contrast, the police possessed no such investigative information against which the informants' veracity could be tested.

[6]For the foregoing reasons, the affidavit would not pass muster under article I, section 13, of the California Constitution (see *People* v. *Campa* (1984) 36 Cal.3d 870, 880 [206 Cal.Rptr. 114, 686 P.2d 634]), were its sufficiency under state constitutional standards still an issue.

[7]Resolution of the issue of probable cause was necessary in order to resolve the issue of *Leon*'s application. Consequently, it was not possible to follow the court's suggestion in *Leon* that it will sometimes be possible to reach the good faith issue first. (See *id.,* 468 U.S. 897, 925 [82 L.Ed.2d 677, 700, 104 S.Ct. 3405, 3422-3423].)

511 P.2d 33]; see also *People* v. *Shuey* (1975) 13 Cal.3d 835, 846-847 [120 Cal.Rptr. 83, 533 P.2d 211]; *Reinert* v. *Superior Court* (1969) 2 Cal.App.3d 36, 42 [82 Cal.Rptr. 263].) The United States Supreme Court has also endorsed this restriction. (See *Giordenello* v. *United States* (1958) 357 U.S. 480, 488 [2 L.Ed.2d 1503, 1510-1511, 78 S.Ct. 1245].) The rule has important practical underpinnings, noted by our Supreme Court in *People* v. *Miller* (1972) 7 Cal.3d 219 [101 Cal.Rptr. 860, 496 P.2d 1228]: "[T]he People cannot introduce on appeal a new theory to justify the search, in view of the defendant's lack of opportunity to present evidence in response to it, to cross-examine the prosecuting witnesses on testimony supporting the new theory, or to argue before the trier of fact the theory's invalidity or inapplicability. [Citations.]" (*Id.*, at p. 227.)[8] There is a limited exception to this rule: "If a question of law only is presented on the facts appearing in the record, the change in theory may be permitted by the reviewing court. [Citation.]" (*People* v. *Carr* (1974) 43 Cal.App.3d 441, 445 [117 Cal.Rptr. 714].)

Thus the People may rely on the good faith exception delineated in *Leon* only if a pure question of law is presented. ■ The court in *Leon* "conclude[d] that suppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." (*Id.*, at p. 918 [82 L.Ed.2d at p. 695, 104 S.Ct. at p. 3419], fn. omitted.) This strongly suggests the good faith exception depends upon ascertaining and evaluating facts about the police investigation.

*Leon*'s discussion of the purposes of the exclusionary rule conveys the same message. " 'The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right. By refusing to admit evidence gained as a result of such conduct, the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused. Where the official conduct was pursued in complete good faith, however, the deterrence rationale loses much of its force.'

" . . . . . . . . . . . . . . . . . . . . .

---

[8]While *Leon* was not decided until approximately one month after the section 995 motion was denied, the good faith exception was not unknown prior to *Leon*. It had been discussed but not reached in *Gates* and adopted by one federal circuit. (*United States* v. *Williams* (5th Cir. 1980) (en banc) 622 F.2d 830, cert. den. 449 U.S. 1127 [67 L.Ed.2d 114, 101 S.Ct. 946].) In any event, there is no apparent exception to the rule preventing the People from arguing a new theory on appeal solely based on the recency of a particular decision.

" 'If the purpose of the exclusionary rule is to deter unlawful police conduct, then evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment.' [Citations.] In short, where the officer's conduct is objectively reasonable, 'excluding the evidence will not further the ends of the exclusionary rule in any appreciable way; for it is painfully apparent that . . . the officer is acting as a reasonable officer would and should act under the circumstances. Excluding the evidence can in no way affect his future conduct unless it is to make him [or her] less willing to do his duty.' [Citation.]" (*Id.,* at pp. 919-920 [82 L.Ed.2d at pp. 696-697, 104 S.Ct. at pp. 3419-3420], fn. omitted.)

■ In enumerating the instances where the exclusionary rule is appropriately applied, the court again demonstrated the importance of the facts surrounding the investigation. "We conclude that the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion. We do not suggest, however, that exclusion is always inappropriate in cases where an officer has obtained a warrant and abided by its terms. '[S]earches pursuant to a warrant will rarely require any deep inquiry into reasonableness,' [citation], for 'a warrant issued by a magistrate normally suffices to establish' that a law enforcement officer has 'acted in good faith in conducting the search.' [Citation.] Nevertheless, the officer's reliance on the magistrate's probable-cause determination and on the technical sufficiency of the warrant he [or she] issues *must be objectively reasonable* [citation], *and it is clear that in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued.*

"Suppression therefore remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his [or her] reckless disregard of the truth. [Citation.] The exception we recognize today will also not apply in cases where the issuing magistrate wholly abandoned his [or her] judicial role in the manner condemned in *Lo-Ji Sales, Inc.* v. *New York,* 442 U.S. 319, (1979); in such circumstances, no reasonably well-trained officer should rely on the warrant. *Nor would an officer manifest objective good faith in relying on a warrant based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'* [Citations.] ■ Finally, depending on the circumstances of the particular case, a warrant may be so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be

valid. [Citation.]" *(United States* v. *Leon, supra,* 468 U.S. 897, 923 [82 L.Ed.2d 677, 698-699, 104 S.Ct. 3405, 3421-3422], fns. omitted, italics added.)[9]

 Thus, application of the good faith exception requires a factual presentation of the officers' activity which is *then* measured against a standard of objective reasonableness. (Cf. *People* v. *Leyba* (1981) 29 Cal.3d 591, 596-597 [174 Cal.Rptr. 867, 629 P.2d 961]; *People* v. *Lawler* (1973) 9 Cal.3d 156, 160 [107 Cal.Rptr. 13, 507 P.2d 621].) The conduct is measured by a standard of objective reasonableness, but a court still must possess sufficient information about the conduct to make such a judgment.

Granted, in some cases where the good faith exception was not specifically litigated in the trial court, an appellate court may still be able to conclude "[t]he officers . . . took every step that could reasonably be expected of them," to use the court's phrase from *Leon*'s companion case, *Massachusetts* v. *Sheppard* (1984) 468 U.S. 981, 989 [82 L.Ed.2d 737, 744, 104 S.Ct. 3424, 3429]. This is not such a case.

Application of the good faith exception will customarily require presentation of facts about the manner in which the officers pursued their investigation. The *Leon* majority says as much. "As we have already suggested, the good-faith exception, turning as it does on objective reasonableness, should not be difficult to apply in practice. When officers have acted pursuant to a warrant, the prosecution should ordinarily be able to establish objective good faith without a substantial expenditure of judicial time." *(Id.,* at p. 924 [82 L.Ed.2d at p. 699, 104 S.Ct. at p. 3422]; see also *People* v. *Howard* (1984) 162 Cal.App.3d 8, 20 [208 Cal.Rptr. 353].)[10]

The present record does not permit a determination that the officers' conduct was objectively reasonable. Put another way, application of *Leon* to

---

[9]As this passage suggests, even the Supreme Court in *Leon* recognized the interposition of a magistrate in the search process does not cure all Fourth Amendment defects. "Deference to the magistrate . . . is not boundless. . . . [¶] . . . [R]eviewing courts will not defer to a warrant based on an affidavit that does not 'provide the magistrate with a substantial basis for determining the existence of probable cause.' [Citation.] 'Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his [or her] action cannot be a mere ratification of the bare conclusions of others.' [Citations.] Even if the warrant application was supported by more than a 'bare bones' affidavit, a reviewing court may properly conclude that, notwithstanding the deference that magistrates deserve, the warrant was invalid because the magistrate's probable-cause determination reflected an improper analysis of the totality of the circumstances, [citation] . . . ." *(Id.,* at pp. 914-915 [82 L.Ed.2d at pp. 693-694, 104 S.Ct. at pp. 3417-3418], fn. omitted.)

[10]Notwithstanding the well recognized problems with information from anonymous sources, the mere fact of anonymity does not automatically render the motives of the informant fatally suspect, as Justice Wallin suggests. *Any* informant *may* have motives for informing borne of a desire to wreak havoc with an accused's life. This is but one aspect of reliability that is an ever present consideration in evaluating accusations of criminal activity.

this case does not present a pure issue of law. Other than the bare statement in the search warrant affidavit, nothing is known about how the police pursued the investigation in this case.

Too much is left to speculation. *People* v. *Kershaw, supra,* 147 Cal.App.3d 750, again provides a useful contrast. There, too, the police received an anonymous report of narcotics activity. But those officers conducted a surveillance, confirming unusual foot traffic at the suspect residence. A record check also revealed a recent narcotics arrest of the suspect. Here, on the other hand, there is no evidence the police *attempted* to verify the anonymous report of unusual foot traffic. Likewise, it is not known whether the police *attempted* to discover if Higgason had a criminal record.

■ *In re Lance W., supra,* 37 Cal.3d 873, does not undermine this conclusion. There the People *did* argue the dispositive issues, lack of standing and the abolition of the vicarious exclusionary rule by Proposition 8, before the trial court. It sustained the People's position, and was ultimately affirmed by the California Supreme Court. The United States Supreme Court has held this very issue, lack of standing to assert Fourth Amendment claims, may not be asserted by the prosecution for the first time on appeal. (*Steagald* v. *United States* (1981) 451 U.S. 204, 208-211 [68 L.Ed.2d 38, 43-45, 101 S.Ct. 1642].) It does not appear *Leon* upsets settled rules of appellate procedure in addition to overhauling Fourth Amendment law.

■ The People may not urge the application of *Leon* for the first time on review via this writ proceeding. The fact *Leon* is retroactive (see *People* v. *MacAvoy* (1984) 162 Cal.App.3d 746 [209 Cal.Rptr. 34]; *People* v. *Howard, supra,* 162 Cal.App.3d 8; *People* v. *Helmquist, supra,* 161 Cal.App.3d 609), cannot serve to abrogate the firmly established rule restricting the presentation of new theories on appeal to justify a search.[11]

■ Nor may the case be remanded for supplementary proceedings. The matter comes here via a petition for an extraordinary writ after the denial of a section 995 motion. Review is restricted to "evidence actually offered and received by the magistrate . . . ." (*Buck* v. *Superior Court* (1966) 245

---

[11]Similarly, the "Truth-in-Evidence" provision (Cal. Const., art. I, § 28, subd. (d)) of Proposition 8 does not abrogate the rule either. While it has the effect of requiring a court to apply federal constitutional standards for the exclusion of evidence where state constitutional standards are more restrictive, we believe that is appropriate *for the first time on appellate review* only when a pure issue of law is involved. To hold otherwise would not only upset well settled rules of appellate procedure, it would also raise serious due process questions. The court in *Helmquist* suggests the good faith exception recognized in *Leon* applies to cases not final on appeal. (*People* v. *Helmquist, supra,* 161 Cal.App.3d 609, 616.) That statement cannot properly be construed here to say the People may argue the good faith exception *under the present circumstances* despite not raising the issue below.

Cal.App.2d 431, 433 [54 Cal.Rptr. 282].) The record may not be supplemented by additional evidence. (*Ibid.;* see also *Burnett* v. *Superior Court* (1974) 12 Cal.3d 865 [117 Cal.Rptr. 556, 528 P.2d 372].)

The alternative writ is discharged. Let a peremptory writ of prohibition issue restraining the superior court from taking any further action in the case except to grant petitioner's motion to set aside the information. When this opinion becomes final the stay is dissolved.

**CROSBY, J.,** Concurring.—*There are few principles of human affairs more self-evident than this: The unverified story of an untested informer is of no more moment than a fairy tale on the lips of a child, and the same tale from an anonymous tattler is worth much, much less.*

This warrant was issued without probable cause; the affidavit merely reported anonymous tips uncorroborated in any meaningful way. Before Proposition 8 abolished this state's exclusionary rule (Cal. Const., art. I, § 28, subd. (d); see *In re Lance W.* (1985) 37 Cal.3d 873 [210 Cal.Rptr. 631, 694 P.2d 744]), our Constitution would have required suppression of the evidence. (*People* v. *Campa* (1984) 36 Cal.3d 870, 884 [206 Cal.Rptr. 114, 686 P.2d 634]; *People* v. *Kershaw* (1983) 147 Cal.App.3d 750, 756-757 [195 Cal.Rptr. 311].)

Even under the amorphous "totality of the circumstances" standard announced in *Illinois* v. *Gates* (1983) 462 U.S. 213 [76 L.Ed.2d 527, 103 S.Ct. 2317] just a few months before the warrant was issued, it would also have failed federal scrutiny. The affidavit there, although originating in anonymous information, disclosed far more detailed facts and much greater investigative corroboration than the pitiful recitation in this case.[1] Nevertheless, despite the patent illegality of the warrant under article I, section 13 of the California Constitution and the Fourth Amendment of the United States Constitution, suppression of its gleanings is permitted only if currently required by the federal exclusionary rule. (Cal. Const., art. I, § 28, subd. (d).)

We have recognized that the exclusionary rule does not necessarily apply in every instance in which the Fourth Amendment is violated. (E.g., *Gordon J.* v. *Santa Ana Unified School Dist.* (1984) 162 Cal.App.3d 530, 542-543 [208 Cal.Rptr. 657].) And the number of exceptions is expanding apace: The most recent addition to the list? Searches conducted in good faith reli-

---

[1]The *Gates* affidavit contained, in my view, enough detailed corroboration to satisfy the standards of *Spinelli* v. *United States* (1969) 393 U.S. 410 [21 L.Ed.2d 637, 89 S.Ct. 584] and *Aguilar* v. *Texas* (1964) 378 U.S. 108 [12 L.Ed.2d 723, 84 S.Ct. 1509], the majestic cases *Gates* overruled.

ance on improvidently issued warrants. (*United States* v. *Leon* (1984) 468 U.S. 897 [82 L.Ed.2d 677, 104 S.Ct. 3405].) Thus, the question of whether suppression is now required under federal law is considerably more difficult than it would have been on the day of the search in this case.

In *Leon,* the United States Supreme Court eliminated automatic exclusion for evidence obtained by warrants executed in good faith but without probable cause. Although the warrant in *Leon* almost certainly could—and would—have been upheld under the *Gates* test, the court chose instead to strike at the exclusionary rule itself. (*Id.,* at p. 906 [82 L.Ed.2d at p. 687].) A warrant's validity is no longer the sole inquiry at a suppression hearing, merely a first step in the analysis. Suppression is available, with certain exceptions noted below, only where the warrant is both invalid *and* served in bad faith; and, as to pending cases, we are told *Leon* is retroactive. (*People* v. *MacAvoy* (1984) 162 Cal.App.3d 746, 760 [209 Cal.Rptr. 34]; *People* v. *Helmquist* (1984) 161 Cal.App.3d 609, 616 [207 Cal.Rptr. 718], mod. 162 Cal.App.3d 202e.)

The momentous nature of the *Leon* decision can be appreciated by reference to Justice Brennan's bitter dissent: "It now appears that the Court's victory over the Fourth Amendment is complete. That today's decision represents the pièce de résistance of the Court's past efforts cannot be doubted, for today the Court sanctions the use in the prosecution's case-in-chief of illegally obtained evidence against the individual whose rights have been violated—a result that had previously been thought to be foreclosed." (*United States* v. *Leon, supra,* 468 U.S. at p. 929 [82 L.Ed.2d at p. 702] (dis. opn. of Brennan, J.).)

As expressed in the majority opinion, the rationale of the new rule is as follows: "[T]he marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial cost of exclusion. We do not suggest, however, that exclusion is always inappropriate in cases where an officer has obtained a warrant and abided by its terms. . . . '[A] warrant issued by a magistrate normally suffices to establish' that a law enforcement officer has 'acted in good faith in conducting the search.' [Citation.] Nevertheless, the officer's reliance on the magistrate's probable-cause determination and on the technical sufficiency of the warrant he issues must be objectively reasonable [citation], and it is clear that in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued." (*Id.,* at pp. 922-923 [82 L.Ed.2d at p. 698], fns. omitted.)

The court then listed a narrow range of circumstances in which suppression will be available in searches conducted pursuant to warrant. First, the

rule of *Franks* v. *Delaware* (1978) 438 U.S. 154 [57 L.Ed.2d 667, 98 S.Ct. 2674] survives: Where "the magistrate . . . in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth. [Citation.]" (*United States* v. *Leon, supra,* 468 U.S. at p. 923 [82 L.Ed.2d at pp. 698-699].) Next, *Leon* "will also not apply in cases where the issuing magistrate wholly abandoned his judicial role in the manner condemned in *Lo-Ji Sales, Inc.* v. *New York,* 442 U.S. 319 (1979); in such circumstances, no reasonably well-trained officer should rely on the warrant." (*United States* v. *Leon, supra,* at p. 923 [82 L.Ed.2d at p. 699].) The third instance is both the heart of the holding—and startling in its ramifications—but more of it below: "Nor would an officer manifest objective good faith in relying on a warrant based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.' [Citations.]" (*Ibid.*) The court concluded its brief list with the following: "Finally, depending on the circumstances of the particular case, a warrant may be so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid. Cf. *Massachusetts* v. *Sheppard, post,* at 998-991." (*Ibid.*)

The last of the exceptions is not remarkable, but the holding of the cited case is. *Sheppard* is a companion to *Leon;* and although the warrant there was clearly "facially deficient," the search was nonetheless upheld. The affidavit in *Sheppard* related probable cause to conduct a search for evidence in a murder investigation, but the form warrant authorized only a search for controlled substances. Despite this rather grotesque deficiency, the court created a good faith exception within its own exception: "[T]he police conduct in this case clearly was objectively reasonable and largely error-free. An error of constitutional dimensions may have been committed with respect to the issuance of the warrant, but it was the judge, not the police officers, who made the critical mistake. '[T]he exclusionary rule was adopted to deter unlawful searches by police, not to punish the errors of magistrates and judges.' [Citation.] Suppressing evidence because the judge failed to make all the necessary clerical corrections despite his assurances that such changes would be made will not serve the deterrent function that the exclusionary rule was designed to achieve." (*Massachusetts* v. *Sheppard* (1984) 468 U.S. 981, 990-991 [82 L.Ed.2d 737, 745, 104 S.Ct. 3424].) Thus, it appears the *Leon* exceptions themselves will be narrowly applied. (See in addition to *Sheppard, People* v. *MacAvoy, supra,* 162 Cal.App.3d 746.)

Nevertheless, I agree the writ sought here must issue—even after *Leon*—but not for the reason offered by Justice Sonenshine. It seems illogical to concede *Leon* is retroactive (see lead opn., at pp. 941, 945, relying on

*People* v. *MacAvoy, supra,* 162 Cal.App.3d 746, 760 and *People* v. *Helmquist, supra,* 161 Cal.App.3d 609, 616), while at the same time holding the prosecution to a level of prescience in anticipating its rule any horseplayer would surely envy. Astute observers could have predicted reversal in *Leon* after *Gates,* but few would have anticipated the rationale of the opinion.

Moreover, there is no reason to believe the prosecution argued good faith in the trial court in either *MacAvoy* or *Helmquist,* the California cases applying *Leon* retroactively. And, while the government did urge good faith in the district court in *Leon* itself, on appeal it did not, relying only upon *Gates.*

The cases cited by Justice Sonenshine which reject new legal theories on appeal are not similar to this one. None involved a change in the law, as *Leon* did, i.e., the virtual elimination of the exclusionary rule in cases involving search warrants. In each the new theory was not a novel legal argument, but a familiar and established doctrine not raised in the initial trial court proceedings.

In *People* v. *Miller* (1972) 7 Cal.3d 219 [101 Cal.Rptr. 860, 496 P.2d 1228], the prosecution justified the search of the defendant's vehicle, and subsequently its contents, based on the need for safekeeping of his equipment after he had been arrested on traffic warrants. On appeal it sought to add the argument that the search was reasonable in any event, contending the officers had probable cause to arrest Miller for possession of stolen property as well. The Supreme Court rejected the argument on the merits *and* because it was raised for the first time on appeal. *Reinert* v. *Superior Court* (1969) 2 Cal.App.3d 36 [82 Cal.Rptr. 263] was similar; there an arrest and search were defended in the trial court on the ground Reinert was drunk in public (Pen. Code, § 647, subd. (f)). The prosecution was not permitted to shift to a new justification for the arrest in the Court of Appeal.

*Lorenzana* v. *Superior Court* (1973) 9 Cal.3d 626 [108 Cal.Rptr. 585, 511 P.2d 33] presented a somewhat different slant. Anticipating a cool reception in the Supreme Court to the justification for a warrantless search accepted in the trial court, the prosecution requested a remand in order to present evidence to establish inevitable discovery. The court refused: "If the People had other theories to support their contention that the evidence was not the product of illegal police conduct the proper place to argue those theories was on the trial level at the suppression hearing. The People offered no such argument at that hearing and may not do so for the first time on appeal. To allow a reopening of the question on the basis of new legal theories to support or contest the admissibility of the evidence, would defeat the purpose of Penal Code section 1538.5 and discourage parties from pre-

senting all arguments relative to the question when the issue of admissibility of evidence is initially raised. [Citations.]" (*Id.*, at p. 640, fn. omitted.)

*People* v. *Shuey* (1975) 13 Cal.3d 835 [120 Cal.Rptr. 83, 533 P.2d 211] is legally similar. There the prosecution originally disavowed the argument that a police occupation of a residence while a warrant was sought could be supported on the ground the defendant was under lawful arrest at the time. Instead, it suggested the conduct was required by exigent circumstances. The Court of Appeal rejected that contention and remanded for a determination as to whether the evidence was obtained as a fruit of the illegality (*Shuey* v. *Superior Court* (1973) 30 Cal.App.3d 535 [106 Cal.Rptr. 452]). The district attorney then attempted to shift to the lawful arrest theory; and the Supreme Court, following *Lorenzana,* rejected the effort.

These cases are readily distinguishable from the present: No change in the law precipitated the prosecution's attempt to add a new theory in any of them. Search incident to lawful arrest and inevitable discovery were tried and true prosecution pitches; it was entirely reasonable to reject belated attempts to deliver them after the original suppression hearing.

The revolutionary holding of *Leon* presents an altogether different situation, however. As here, "good faith" will not have been raised previously in most cases pending on appeal. Thus, the effect of the lead opinion's rationale would be to reduce the proclaimed retroactivity of *Leon* to those rare instances where good faith was argued at the trial level. I believe this to be a poor practice for a number of reasons, not the least of which is a belief that similar lawsuits ought to be treated similarly. And I do not view a fortuitous and previously unsupportable argument made in the trial court before *Leon* to be a very sensible means of distinguishing otherwise identical cases.

Also, basing a decision on the failure to anticipate *Leon* will not promote judicial economy. It will instead encourage prosecutors to squander public funds and scarce judicial resources in desperate and generally spurious attacks on well-settled precedent merely to preserve an appellate position which may some day gain favor. For example, many have surmised the United States Supreme Court will next extend the good faith exception to warrantless searches. If the lead opinion is correct, the prosecution should be offering evidence of good faith in every suppression motion brought in relation to a warrantless search—not a happy prospect for overworked trial judges, who under current law can only yawn and say, "So what?"

Finally, the direction to suppress the evidence with no clear holding as to the validity of the search will trigger dismissal but may not bar refiling,

assuming this matter has not previously been dismissed (Pen. Code, § 1387). A new round of litigation will present a very difficult law of the case problem for several reasons. (See, e.g., *People* v. *Shuey, supra,* 13 Cal.3d 835.)

Our decision will be the law of the case with respect to whether the warrant was issued with probable cause, for on that we agree. But since a negative answer to that question no longer compels automatic suppression of the evidence, the prosecution, wrapping itself in *Leon* and its proclaimed retroactivity, might claim the validity of the search on the good faith standard is still open, despite Justice Wallin's view that the affidavit is so weak, even good faith cannot save the search.

There is a relatively simple solution to all of this, however. Despite my colleague's understandable reluctance to address good faith at this time, that is the most expeditious course in my view. We can apply the *Leon* standard of objective reasonableness as well as a trial court, at least on these facts.

What evidence could be produced at a hearing which could possibly assist the prosecution? Could the affiant be heard to claim his selection of this issuing magistrate was based on his high regard for the latter's intelligence, rather than the other way round? Could the district attorney offer evidence of the judge's good track record at suppression hearings and prove the officer had taken that into account? Indeed, I am troubled by the whole notion of police nullification of a magistrate's *command* to execute a search warrant: *Leon* has not just changed the rules; it has turned the system on its head.

Although I have located none which has been remanded for that purpose, I concede some recent cases seem to support the notion evidence might be appropriately offered on the subject of good faith: E.g., "There is no evidence indicating that Officer White or the other officers who accompanied him were acting in bad faith, and we therefore find the search was conducted with a good faith belief in its validity. [¶] The next (and more important) question is whether the good faith belief in the validity of the warrant was *objectively reasonable.*" (*People* v. *MacAvoy, supra,* 162 Cal.App.3d at p. 763; see also *Massachusetts* v. *Sheppard, supra,* 468 U.S. 981, 990-991 [82 L.Ed.2d 737, 745].)

As the preceding language indicates, however, *MacAvoy* also supports the proposition that an appellate court may apply the objective reasonableness standard in the first instance. (See also *People* v. *Helmquist, supra,* 161 Cal.App.3d at p. 618.) I see no reason not to do so here. It would, hopefully, resolve a case which should be concluded now and give some guid-

ance to the trial courts as to what an objectively reasonable search is—or is not. For, while I am aware this warrant was signed by one magistrate, upheld by another at the preliminary hearing, and approved again in the superior court, no properly trained officer aware of the new power of police nullification conferred in *Leon* could have served it in good faith,[2] particularly an officer who has "worked narcotic enforcment [*sic*] for a total of ten years return and . . . [has] participated in hundred [*sic*] of arrests of person [*sic*] for violations of controlled substance laws at the Community College level [*sic*] and . . . attended numerous formal courses in this field at the state and federal level."[3] Any rookie officer knows uncorroborated, unknown tipsters cannot provide probable cause for an arrest or search warrant.

*There are few principles of human affairs more self-evident than this: The unverified story of an untested informer is of no more moment than a fairy tale on the lips of a child, and the same tale from an anonymous tattler is worth much, much less.*

**WALLIN, J.,** Concurring.—This case graphically illustrates the difficulties caused by the United States Supreme Court's decision in *United States* v. *Leon* (1984) 468 U.S. — [82 L.Ed.2d 677, 104 S.Ct. 3405], recognizing a "good faith" exception to the exclusionary rule. John Higgason's home was invaded under the authority of a search warrant obtained solely on information supplied by uncorroborated anonymous informants. This court unanimously agrees the evidence seized under this warrant must be excluded. However, I am not in complete agreement with either of my learned colleagues (nor they with me) and therefore write separately.

Since pronouncement of the good faith exception to the exclusionary rule was unnecessary to the decision in *Leon*,[1] we must conclude the Supreme Court was eager to embrace the good faith standard and intends that it have broad application.[2] Nevertheless, I do not see how it can be applied to save a search pursuant to a warrant which is totally unsupported by credible information.[3] Not every Fourth Amendment sin can be forgiven by wrap-

---

[2]Since the determination of the officer is what counts after *Leon*, there is no need to comment as to what the judges could have been thinking.

[3]This apparent mishmash of two pieces of cut-and-paste boilerplate appears in the original.

[1]Justice Crosby's opinion, *ante*, at page 946.

[2]I agree with Justice Crosby and disagree with Justice Sonenshine on the question of whether the People may argue the *Leon* rule for the first time on appeal. *Leon* is retroactive. It surely follows that it can be raised for the first time on appeal. Prosecutors are not required to be prescient or lengthen trial court proceedings by asserting every hopeless argument in order to take advantage of a subsequent new decision. Accordingly I, like Justice Crosby, view this case as though *Leon* applies.

[3]Both Justice Sonenshine and Justice Crosby emphasize the unreliability of anonymous sources and I am in complete agreement with their views.

ping it in a good faith package. Every citizen is entitled to be secure from the possibility that angry neighbors, misguided practical jokers, ex-spouses, heartbroken ex-lovers or other personal enemies will provide anonymous information leading to police intrusion into their homes and personal effects. Were we to permit introduction of this evidence, a whole new field would be opened for dealing with one's personal "enemies list." As even an inexperienced police officer knows, courts have always required corroboration of anonymous information because of its inherent unreliability. Nothing in the *Leon* decision can be read to suggest a different result or excuse a lack of corroboration merely because an overworked or inattentive magistrate sanctions the entry.

Since the diversity of our views prevents this decision from having any significant precedential value, we postpone until another day our effort to capture the will-o'-the-wisp and define the good faith exception.