[No. A037327. First Dist., Div. Two. Sept. 7, 1988.]

THE PEOPLE, Plaintiff and Appellant, v.
RICHARD LEE COSTELLO et al., Defendants and Respondents.

432

COUNSEL

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Ronald E. Niver and Don Jacobson, Deputy Attorneys General, for Plaintiff and Appellant.

J. R. Rubin, Michael Satris and Juliana Drous, under appointments by the Court of Appeal, for Defendants and Respondents.

OPINION

SMITH, J.—The superior court ordered burglary and receiving stolen property charges against codefendants Richard Lee Costello, William George Bain and Stephen Paul Rainford dismissed after granting defense motions to suppress the fruits of a warrant search on grounds that the warrant affidavit, when retested without misrepresentations made in violation of the federal Constitution under *Franks* v. *Delaware* (1978) 438 U.S. 154 [57 L.Ed.2d 667, 98 S.Ct. 2674] (*Franks*), failed to support probable cause. The People appeal from the dismissal. (Pen. Code, §§ 1238, subds. (a)(7), (c), 1538.5, subd. (a)(2), 1385, subd. (a).)

We reverse, concluding that the court went too far in striking parts of the search warrant affidavit and that the affidavit, when properly corrected and retested, supports probable cause.

## BACKGROUND

Evidence on the *Franks* hearing consisted of testimony from defendants' joint preliminary hearing plus documents and testimony produced in the

superior court. We briefly summarize that evidence here and will set out additional details as needed in the discussion of issues that follows.

The charges arise from three 1984 burglaries occurring in Santa Rosa over a seven-week period. The first was an early morning break-in at a warehouse for the Rincon Valley Union School District (RVUSD) on October 25. Someone twisted the door handle off a steel door, apparently with a vise-grip or similar tool, and took $9,000 worth of automotive repair tools. A van, found stripped of equipment and abandoned some distance from the warehouse, was also taken.

The second break-in was discovered on the morning of November 11, at the Jolley Business Equipment Company (Jolley) at 540 Mendocino Avenue. Twin steel doors had been pried open, and a heavy instrument like a channel locks or pliers had been used to twist off a rounded bolt. A burglar alarm system on the doors had been bypassed. Over $20,000 worth of typewriters, word processors and other business equipment was taken.

Two days later, on November 13, an anonymous telephone caller told investigating detective Ernesto Olivares that he had been inside the home of Richard Lee Costello at 3148 Midway Drive two days before and had seen a large amount of computer and business equipment there. The caller was interested in receiving a reward but ultimately declined to get involved. Periodic drive-by police surveillance of the house after that did not reveal any suspicious activity.

The third break-in was discovered on December 11, at Montgomery High School. Someone had entered through a skylight, bypassed an alarm system and, once inside, pried open the doors to a classroom containing computer workstations and equipment. Missing was over $35,000 worth of computers, monitors, disc drives, printers and other equipment.

Just after 2 o'clock the next afternoon (December 12), Detective Olivares received a second anonymous phone tip about Costello. This caller, whose voice did not sound like the first caller's, said that Costello was responsible for the school burglary, lived at 3148 Midway Drive, worked at Santa Rosa Luggage Company, was responsible as well for the Mendocino Avenue computer theft three weeks earlier, had those computers and property taken in the RVUSD warehouse theft stored in an outbuilding at the rear of his property, and was planning to move the property either that night or the next morning. The caller said he had just seen Costello and the property. He said that Costello used a pipe wrench on the school door handles and had used the same method of entry in the Mendocino Avenue break-in. When Olivares asked how the burglar alarm was bypassed, the caller said that

Costello used to work for an alarm company (possibly called State Alarm Co.) and knew a great deal about alarm systems. Also, said the caller, Costello had a younger sister who currently attended Montgomery High School. Olivares tape-recorded the conversation.

Armed with this new information and aware that the stolen property was supposed to be moved soon, Olivares quickly corroborated as many of the facts as he could and, sometime between 3 and 4 p.m., began typing up a statement of probable cause (hereafter affidavit) to offer in support of a search warrant for the Midway Drive premises. Meanwhile, he told Detective Gerald Smith (known as Gerald Rammer by the time of these proceedings) about the phone call and possible movement of property, and had him keep watch on the residence.

Smith began his watch at about 4 p.m. in the bedroom of a house across the street, about 75 feet away. He had no description of any particular suspect or vehicle but knew that stolen computer equipment was involved. He first saw a car pull up in front of the house and the driver go inside. Then, at about 5:30 p.m., a small green pickup with a white camper shell pulled up and backed into the driveway in front of a closed garage door, and the man driving it went into the house. Smith could see silhouettes of people walking back and forth inside the house.

About a half hour later, at twilight, the same man left the house, opened the garage door and began loading branches and other debris into the truck bed. The debris came from beside a tree, out of Smith's view. The man also went into the garage, out of view. There was a light on in the garage. Smith did not see any computer equipment in the garage from where he stood.

Midway through loading the debris, the man came from around the side of the house carrying something covered with a blanket, put it on the truck and then loaded more debris behind it. To Smith, the object had the shape and size of a typewriter or keyboard-type computer component. It had what looked like a roller ("reel") part on top, a drop to what could have been a keyboard, and another three-inch drop to the bottom. The owner of the house Smith was using had no prior notion of what the officer was looking for yet, when asked what he thought, said that the object looked like a typewriter.

Convinced that the object could be property taken in the high school burglary and that the man was hiding it, Smith radioed for patrol officers to position themselves at each end of the block in case the truck should try to leave. Smith had been in phone contact with Detective Olivares and knew that a warrant was being secured. He reported this information about the

truck and covered object to Olivares, who by then (about 6:45 p.m.) was at the district attorney's office having his affidavit reviewed.

Olivares incorporated this new information into the affidavit by hand after first determining that a pickup of Smith's description was registered to a Richard Lee Costello. A deputy district attorney signed off on the warrant at 8 p.m.; it was immediately presented to a judge and was issued.

Meanwhile, at about 7 p.m., the truck had left the driveway and was stopped by officers. As it turned out, the driver was defendant Rainford, not Costello. (Detective Smith had not been given any physical description of Costello and did not know who the driver was.) Knowing that a warrant was on the way, the officers held Rainford there and did not search the truck at that point.

Olivares and other officers executed the warrant at the Midway Drive house at 8:20 p.m. They found the suspected stolen property in both the main house and an outbuilding in back. All defendants were arrested and made incriminating statements as a result, with Bain and Rainford specifically confessing involvement in the burglaries. The stopped truck was impounded and later searched, but no stolen property was found—only boxes and debris.

Defendants' *Franks* challenge, raised both at the preliminary hearing in municipal court and again in the superior court, was aimed at asserted misstatements contained in the last paragraph of the affidavit—the handwritten part added at the last minute based on Smith's surveillance information. The municipal court judge rejected the challenge, finding no intentional or reckless misstatements, only negligence.

The superior court judge, hearing the matter de novo (Pen. Code, § 1538.5), impliedly found the misstatements to have been made in reckless disregard of the truth, struck the entire last paragraph from the affidavit and, retesting it without that paragraph, found probable cause lacking. He ordered all fruits of the search suppressed.

## APPEAL

The affidavit, with the officer's recital of experience omitted and with some grammatical and spelling errors corrected in brackets, reads as follows: "On 12-12-84 your affiant was assigned to investigate crime report #84-19350. The report written by Officer Andre Hargrove i[n]dicated that some time between 1915 HRS 12-10-84 and 0600 HRS 12-11-84, Montgomery High School located at 1250 Hahman Dr. was the victim of a burglary

in which in excess of $35,000 in computer equipment was taken. Entry to the School was accomplished through a skylight on the roof. Once inside inner doors were pr[i]ed with an unknown type wrench tool. This information is contained in the attached report by officer Andre Hargrove. Also listed in Hargrove[']s report is a list of the stolen property as describe[d] herein.

"On 12-11-84 Field Technician P. Tunstall was dispatched to the school to meet with representatives of the school alarm company. At this time it was learned by Tunstall that the alarm system had been bypassed to avoid detection by the suspect. This information is contained in the attached supplemental report by Field Technician P. Tunstall.

"On 12-12-84 at approx. 1410 hrs your affiant received a telephone call from an a[n]onymous male with information on this case. The conversation was tape recorded and the tape retained. The caller stated that the person responsible for the theft was a Richard Lee COSTELLO who resides at 3148 Midway Dr. and works at Santa Rosa Luggage Co. The informant further stated that Costello is the same person responsible for a similar theft at a business on Mendocino Ave. about three weeks prior in which computers were also taken.

"The caller went on to tell your affiant that the computers are stored in an out building to the rear of the main house and also property taken from a theft at Rincon Valley School about two months prior. The informant told your affiant that he had just seen Costello and the property and he was planning to move the property this evening or 12-13-84 in the morning.

"The informant said that Costello used a pipe wrench on the door handles to make entry once he was in the building. The informant explained that this is the same method used to gain entry at the Mendocino Ave. break in.

"Your affiant asked the informant if he knew how Costello bypassed the alarm system and he said that Costello used to be employed by an alarm company possibly named State Alarm Co. and knows a great deal about alarm systems. The informant also informed your affiant that Costello has a younger sister who attends Montgomery High School.

"On 11-13-84 your affiant was assigned to investigate a burglary of the Jolley Business Equipment Co. located at 540 Mendocino Ave. in which in excess of $20,000 worth of computers [was] taken. In this case (#84-17499) entry was made by prying the deadbolt lock to the rear door. The alarm in this case was also tampered with and the burglary went undetected.

"On this same day an informant telephoned the business giving his name but wishing to remain anonymous wished to give information in hopes of receiving a reward. The informant ultimately declined to get involved but did give the business and your affiant information on a subject named Richard Lee COSTELLO.

"The informant stated that he had been to Costello's house at 3148 Midway Dr. to collect some money and at that time saw a large amount of computer and business equipment. This occurred on the morning of 11-11-84 the same day as the burglary. Due to the informant[']s unwillingness to get further involved and the lapse of time between the time he saw the equipment and the time he reported his observations a warrant was not obtained at that time. The house however, was watched for some time.

"At that time your affiant received information from SRPD narcotics units that they had received a[n]onymous information on Costello in the past. Am[o]ng this information was information received on 8-13-84 that Costello works at Santa Rosa Luggage Co. This information could not be verified at that time or at the present through such a business.

"Your affiant also located information on the burglary at Rincon Valley Union School that occurred on 10-24/25-84. Entry was made in this case (#84-16486) by forcing the door knobs with a 'vice grip type tool'. Taken was a vehicle, later recovered, and a large amount of tools.

"Your affiant also contacted Montgomery High School and conf[i]rmed that a female last name Costello attends school and is enrolled in computer classes. Your affiant also examined the door knobs taken as evidence and found them to have markings consist[e]nt with a gripping type wrench tool.

"The residence is currently under surv[eillance] by Det. J. Smith from a [site] directly across the street at 3127 Midway Dr. with the owner[']s permission.

"It is your affiant[']s opinion that the [] property taken from the Montgomery High School is located at 3148 Midway Dr. specific[ally] in an out building to the rear of the main house or both. Based on the information received from the informant most of which has been corroborated and the attached reports, your affiant believes that there is sufficient probable cause to bel[ie]ve that the stolen property taken from Montgomer[]y High School is located at 3148 Midway Dr.

"A copy of the aforementioned reports [is] attached hereto and incorporated in this statement of probable cause."

The affidavit's final paragraph, the focus of this appeal, is handwritten in block letters. Changed to upper and lower case letters, it reads: "At 1845 hrs. your affiant was advised by Det. Smith that approx. three males were loading unk. type equipment into a grn w/wht camper shell pick-up lic #1H47873. This license shows in DMV to be a 1977 Toyota pick-up registered to Richard Lee Costello. The truck was seen backed into the drive way of 3148 Midway Dr. in front of the open garage. The garage light was out but the subjects were using a flashlight."

As it developed at the *Franks* hearing, the handwritten paragraph is inaccurate in three ways. First, Detective Smith reported that he saw only *one* male (not "approx. three males") loading the truck. Olivares testified that he confused that information with Smith's report (in the same phone call) that he could see silhouettes of two or three other people *inside the house.* When Olivares made out his police report the next day, he correctly noted that one person was loading the truck.

Second, the mention of "unk. type equipment" being loaded was not as accurate as it might have been. The equipment *was* known, at least to the extent that Smith thought the covered object was shaped like a typewriter. (Olivares did not recall Smith using the word "typewriter," but he knew that the object was covered with a blanket so that Smith could not see it.) Also, as the superior court noted, the word "equipment" is ambiguous; it could connote more than one item whereas Smith only saw one.

Third, it was not true that the "garage light was out" and that a "flashlight" was being used. In fact, the garage light was on and there was no flashlight. The reason for this discrepancy was not explored in testimony. Smith was not asked what he told Olivares over the phone, and Olivares did not recall Smith's words.

I

The People contend that the superior court erred in concluding that the entire final paragraph of the affidavit had to be stricken. They argue that the paragraph's inaccuracies did not amount to the intentionally or recklessly made misstatements that require striking under *Franks.* They also argue that the court struck more from the paragraph than was needed. We partially agree with the first point and, for that reason, agree with the second.

Describing the proffer a defendant must make in order to merit an evidentiary hearing, the Supreme Court in *Franks* stated: "There is . . . a presumption of validity with respect to the affidavit supporting the search

warrant. . . . There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. . . . Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted . . . is only that of the affiant, not of any nongovernmental informant. Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required. . . ." (*Franks, supra,* 438 U.S. 154, 171-172 [57 L.Ed.2d 667, 682].) The "retesting" of the affidavit applies as well, of course, in deciding whether to order suppression: "In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." (*Id.,* at p. 156 [57 L.Ed.2d at p. 672].)

### Reckless disregard

 The superior court judge's comments indicate that he did not find that Detective Olivares deliberately lied; his implied findings were that, as to each inaccurate part of the affidavit, Olivares acted in reckless disregard of the truth. Those being factual questions resolved de novo in the context of a Penal Code section 1538.5 motion, we must uphold every such finding that is supported by substantial evidence. "[W]hat [an] officer actually perceived, or knew, or believed, and what action he took in response . . . are traditional questions of fact, and the statute vests the superior court with the power to decide them. (Pen. Code, § 1538.5, subd. (i).) Accordingly, . . . for the purpose of finding those facts 'the power to judge the credibility of the witnesses, resolve any conflicts in the testimony, weigh the evidence and draw factual inferences, is vested in the trial court. On appeal all presumptions favor the exercise of that power, and the trial court's findings on such matters, whether express or implied, must be upheld if they are supported by substantial evidence.' " (*People* v. *Leyba* (1981) 29 Cal.3d 591, 596-597 [174 Cal.Rptr. 867, 629 P.2d 961], quoting *People* v. *Lawler* (1973) 9 Cal.3d 156, 160 [107 Cal.Rptr. 13, 507 P.2d 621].)

By that review standard, there is enough evidence to support the finding that Olivares acted recklessly in reporting that three men, as opposed to one, were loading the truck. He acknowledged being told that only one

person was doing the loading. Reasonable minds could differ as to whether—given the time pressure in transferring Smith's information to the affidavit, Olivares's "confusion" over the silhouettes of others reportedly seen inside the house, and the fact that he correctly reported the information in his written report the next day—the mistake was in reckless disregard of the truth (as the superior court judge found) or merely negligent (as the municipal court judge found). Faced with support for either conclusion we must, on review of the superior court's finding, uphold it.

On the other hand, we find too little support for the finding that the affidavit's mention of "unk. type equipment" was made in *reckless disregard* of the truth. The statement was absolutely correct as far as it went. Smith, with the independent concurrence of a citizen who had seen it from the same vantage point, thought the object was shaped like a typewriter, and he reported that observation over the phone. Olivares, realizing that the blanket prevented Smith from actually seeing the object, put down *"unk. type equipment"* (italics added). We do not see how using those words, instead of words to the effect "a blanket-covered object having the shape of a typewriter," manifested a "reckless disregard" for the truth under *Franks.* (Such a correction would, in any event, only strengthen—not diminish—probable cause in the affidavit.) The further problem that the word "equipment" might connote more than one piece of equipment shows negligence at most.

Finally, the recklessness finding as to the type of lighting used is also unsupported. In order to establish the mental state of "reckless disregard" by a preponderance of the evidence, as required by *Franks, supra,* 438 U.S. 154, 156 [57 L.Ed.2d 667, 672], we think there had to be some testimony, on these facts, as to what Smith told Olivares over the phone. It is not enough to simply show a discrepancy between the actual facts and the facts given in the affidavit. Smith was not asked what words he used to describe the lighting, and Olivares merely agreed when asked, "It would appear that this is information that Detective Smith must have given you over the telephone; is that correct?" On this record we are left to speculate, first, who conveyed the faulty information, and second, whether miscommunications by either or both of the officers might have been innocent or negligent, rather than reckless. (Cf. *People* v. *Wilson* (1986) 182 Cal.App.3d 742, 751-752 [227 Cal.Rptr. 528].) Even if we could sustain a recklessness finding, it would have had no significant impact on the magistrate to know that a garage light rather than a flashlight was used.

We acknowledge that the existence of one deliberate misstatement in an affidavit lends some weight to the idea that other misstatements might have

been made with the same state of mind. In this case, however, that inference does not render the overall evidence substantial.

### Correcting the affidavit

■ Our conclusion that there is insufficient support for any of the court's "reckless disregard" findings except the "three males" statement means, of course, that the court struck too much from the affidavit. The paragraph suffered from only two *Franks* defects (italicized): "At 1845 hrs. your affiant was advised by Det. Smith that *approx. three males* were loading unk. type equipment into a grn w/wht camper shell pickup lic #1H47873. This license shows in DMV to be a 1977 Toyota pick-up registered to Richard Lee Costello. The truck was seen backed into the drive way of 3148 Midway Dr. in front of the open garage. The garage light was out but the *subjects* were using a flashlight." The phrase "approx. three males were loading" should have been corrected to read "one male was loading," and the phrase "subjects were using" should have been corrected to read "subject was using."

The superior court operated on the paragraph with an ax instead of a scalpel, apparently giving no thought to correcting rather than just striking out the inaccuracies. Taking a literalist's approach, the court struck out all phrases it found defective and then, observing that the rest of the words lacked context and made no grammatical sense standing alone, struck the entire paragraph, including all references to the pickup truck, its registered owner, its arrival at the house, the hour, the open garage, the loading going on or the fact that anyone was even there. This was the wrong approach.

Federal and state courts recognize that two types of correction are envisioned in *Franks*: (1) material misstatements are stricken and (2) material omissions are added. The aim in either case is not punitive but remedial—to make the affidavit read as it should have so that the reviewing court can then retest for probable cause support. (*United States* v. *Ippolito* (9th Cir. 1985) 774 F.2d 1482, 1486-1487, fn. 1, and cases cited; *United States* v. *Condo* (9th Cir. 1986) 782 F.2d 1502, 1506; *United States* v. *Stanert* (9th Cir. 1985) 762 F.2d 775, 780-781, mod. and rehg. den., 769 F.2d 1410; *People* v. *Kurland* (1980) 28 Cal.3d 376, 383-389, cert. den. (1981) 451 U.S. 987 [168 Cal.Rptr. 667, 618 P.2d 213]; *People* v. *Luevano* (1985) 167 Cal.App.3d 1123, 1127-1128 & fn. 3 [213 Cal.Rptr. 764].) To that end, correction of the affidavit should not take one form (striking or adding) to the exclusion of the other. Where, as in this case, the defendant makes out a case for striking a misstatement, the proper remedy is to add back the true facts known to the affiant on that precise point, if revealed at the hearing, rather than strike and jettison the passage altogether. (Cf. *United States* v.

*Ippolito, supra,* 774 F.2d at pp. 1486-1487 & fn. 1.) That approach is especially critical where, as here, simply striking the misstatements leaves material unstricken facts standing out of context and ungrammatically stated. Also, nothing in the rationale of *Franks* prevents a court from editing a partially stricken sentence so that its remaining contents can stand on their own. Otherwise, we put form over substance and encourage affiants to state each fact dryly, in separate sentences, avoiding all subordinate and dependent clauses, compound subjects and other rudiments of effective writing.

## II

■ The People contend, and we agree, that the affidavit, when retested, supports probable cause.

We start with the fundamentals applicable to warrants generally. "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability" of criminal activity. (*Illinois* v. *Gates* (1983) 462 U.S. 213, 238 [76 L.Ed.2d 527, 548, 103 S.Ct. 2317].) The duty of a reviewing court "is simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed. [Citation.]" (*Id.,* at pp. 238-239 [76 L.Ed.2d at p. 548].)

■ Defendants vigorously contend that we must defer to the *superior court's* conclusion on probable cause rather than the issuing magistrate's. We disagree. Whatever merit the proposition might have in a different case, it makes no sense here because the superior court assessed probable cause based on the erroneous premise that the entire last paragraph of the affidavit had to be ignored.[1]

Alternatively, we could defer to the magistrate's determination. Federal authority in the analogous context of a magistrate having improperly considered illegally obtained information supports that view and reinforces our conclusion that deference to the superior court's probable cause decision is inappropriate. The Court of Appeals in *U.S.* v. *Grandstaff* (9th Cir. 1987) 813 F.2d 1353 (cert. den. *sub nom. Brown* v. *United States* (1987) 485 U.S. 908 [98 L.Ed.2d 78, 108 S.Ct. 119]), rejected the same argument that defendants raise here: "Grandstaff argues that we should defer to the district court's determination, much as we defer to the decision of the magistrate in

---

[1] No one argues that we should defer to the municipal court judge who, on a motion to dismiss brought at the preliminary hearing in this case, found no *Franks* violation. That court obviously did not find it necessary to retest the affidavit, and the superior court's subsequent, contrary determination was made de novo under Penal Code section 1538.5.

the normal case where the affidavit is unredacted. [Citations.] The fallacy in this argument is that the district court did not confront directly, as did the magistrate, the question whether to issue the warrant. Nor would deferring to the district court promote the policy of encouraging police officers to apply for warrants. In brief, the district court does not stand in the shoes of the magistrate. Deferring to the district court in this case would serve no useful purpose. [¶] It will not promote accuracy. We are in as good a position as was the district court to assess the legal sufficiency of the redacted affidavit. [Citations.]" (*Id.,* at p. 1355.) Finding de novo review of the district court's decision appropriate, the Court of Appeals conducted its own review of the redacted affidavit, deferring to the magistrate as mandated by *Illinois* v. *Gates, supra,* 462 U.S. 213, 238-239 [76 L.Ed.2d at p. 548], as this passage makes clear: "Because the affidavit presented to the magistrate contained [illegally obtained] information the question becomes whether the affidavit, purged of the illegally obtained information, *still affords the magistrate a substantial basis for concluding that a search would uncover evidence of wrongdoing.* If it does, we should reverse the district court [order of suppression]." (*Ibid.*; cf. *Franks, supra,* 438 U.S. 154, 172 [57 L.Ed.2d 667, 682] [retesting is to determine whether the affidavit contains "support for a finding" of probable cause].)

However, the matter is less clear cut in our case. The excised information in *Grandstaff* did not call the affiant's veracity into question, as is the case here. In the context of state law formerly requiring that warrants supported by reckless or deliberate misstatements be quashed without retesting (*People* v. *Luevano, supra,* 167 Cal.App.3d 1123, 1126-1128), our state Supreme Court has questioned whether deference to a magistrate whose assessment of the affiant's overall veracity might have been affected by knowledge of misstatements is appropriate. (*People* v. *Cook, supra,* 22 Cal.3d 67, 86-87.) Whether similar considerations should restrict traditional deference under federal law, which now binds California courts (Cal. Const., art. I, § 28, subd. (d)), is unclear. Federal law's willingness to retest a deliberately falsified warrant affidavit, rather than quash the warrant outright, is one indication that our state high court's concerns are not shared in degree.

We need not decide in this case. Whether we undertake a true independent review of the affidavit, assessing veracity ourselves, or defer to the issuing magistrate, our answer is the same: the corrected affidavit amply supports probable cause. On the question of veracity, we simply note that the affiant was found to be reckless, not deliberately untruthful, and that his recklessness was apparently due to the haste with which he had to draft the handwritten last paragraph of the affidavit. This does not cast serious doubt on his veracity generally, and his voluminous other allegations are corroborated in most respects by police reports attached to the affidavit. On

the question of probable cause, we bear in mind that the constitutional preference for magistrate-made probable cause determinations means that less competent and persuasive evidence is required to support probable cause for a warrant than would be required for a warrantless search. (*People v. Fein* (1971) 4 Cal.3d 747, 752 [94 Cal.Rptr. 607, 484 P.2d 583]; *Skelton* v. *Superior Court* (1969) 1 Cal.3d 144, 150 [81 Cal.Rptr. 613, 460 P.2d 485]; *People* v. *O'Leary* (1977) 70 Cal.App.3d 323, 327 [138 Cal.Rptr. 667], and cases cited.)

We have already concluded that the only corrections needed in this case under *Franks* were to change from plural to singular any references to the number of men loading the truck. Defendants, too confident that the entire last paragraph was properly stricken, confine their probable cause analysis to the affidavit's other paragraphs standing alone, which they urge disclosed only an anonymous tip plus independent corroboration only as to general, "pedestrian" facts that did not show criminal activity. (See *Higgason* v. *Superior Court* (1985) 170 Cal.App.3d 929, 940 [216 Cal.Rptr. 817].) Although we need not consider the effect of the last paragraph's total excision, we consider defendants' argument in light of the affidavit as less drastically modified.

■■ ■ Information from an untested informant will not establish probable cause unless "corroborated in essential respects by other facts, sources or circumstances. [Citation.]" (*People* v. *Fein, supra,* 4 Cal.3d 747, 752.) "[I]n order for corroboration to be adequate, it must pertain to defendant's alleged *criminal* activity; accuracy of information regarding the suspect generally is insufficient. [Citations.]" (*Id.,* at p. 753.) The mandate that facts must "pertain" to criminal activity "is met if police investigation has uncovered probative indications of criminal activity along the lines suggested by the informant." (*People* v. *Kershaw* (1983) 147 Cal.App.3d 750, 759 [195 Cal.Rptr. 311], citations omitted.) Even observations of seemingly innocent activity suffice alone, as corroboration, if the anonymous tip casts the activity in a suspicious light. (*Illinois* v. *Gates, supra,* 462 U.S. 213, 244, fn. 13 [76 L.Ed.2d at p. 552].) "[P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity. By hypothesis, therefore, innocent behavior frequently will provide the basis for a showing of probable cause; to require otherwise would be to *sub. silentio* impose a drastically more rigorous definition of probable cause than the security of our citizens' demands. . . . In making a determination of probable cause the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts." (*Ibid.*) In these cases, "the quantum of detail, particularly as it describes subsequently verified future activity, is regarded as a significant factor in assessing the informant's reliability

. . . ." (*People* v. *Lissauer* (1985) 169 Cal.App.3d 413, 423 [215 Cal.Rptr. 335]; *Higgason* v. *Superior Court, supra,* 170 Cal.App.3d 929, 939-940 ["pedestrian" facts lacking some degree of suspicion will not do ].) Detail also supports an inference of personal knowledge. (*People* v. *Kershaw, supra,* 147 Cal.App.3d 750, 758.)

Here there was abundant detail in the December 12 caller's tip, and Olivares was able to corroborate most of it. He verified Costello's name, residence and (using an aerial photo) the fact that there was an outbuilding to the rear of the property. Unable to contact anyone at Santa Rosa Luggage who could confirm Costello's employment there and learning that Costello was not in that day, Olivares knew that the Santa Rosa Police Department's narcotics and vice unit had independently received the same employment information. Olivares could not verify that Costello previously worked at the alarm company.

The caller stated that Costello had stolen property from the RVUSD, Mendocino Avenue (Jolley) and Montgomery High School thefts stored in his residence and outbuilding, and that Costello was responsible for the latter two thefts. The caller knew that computer-type equipment had been taken, the approximate dates of the thefts, and the fact that entry was gained by using a pipe wrench to pry off the handles after gaining entry. A check of police records and the pried-off handles saved as evidence in the high school burglary confirmed the dates, the thefts, the type of property taken and the burglar's use of a gripping-type tool on the doors.

Doing his own testing of the informant's knowledge, the officer asked how the alarm systems were bypassed, and the caller said that Costello was an experienced, ex-alarm company employee who could easily bypass such a system. Although the officer was unable to verify the alarm company employment, he did confirm from police records that alarm systems had in fact been bypassed in the latest two burglaries and that entry to the high school was made through a skylight before the interior doors were pried open. Apparently as a further suggestion how the high school burglary might have been perpetrated, the caller said that Costello had a younger sister who currently attended the school. A fellow officer not only verified with the school that the younger sister attended, but also that she was enrolled in computer classes. Olivares knew, of course, that the theft was from the school's computer classroom.

Other corroboration, about a month old but still of some corroborative value in the totality of circumstances, came from an earlier, apparently different anonymous caller two days following the Mendocino Avenue break-in. That caller advised the owners of the victimized business and

Detective Olivares that he had been to Costello's house (same address) to collect some money and, while there, saw "a large amount of computer and business equipment." That tip, plus knowledge that similar anonymous information had been received by the narcotics unit, led to drive-by surveillance of the house (some by Olivares) that proved unfruitful.

Of course, the surveillance by Detective Smith on December 12, the day of the search and arrests, added much corroboration. Olivares did not know Costello by sight and had not seen the camper-shell pickup truck on any of his drive-bys. When Smith called in about seeing the truck, he gave Olivares the truck's license number and description. Olivares corroborated the apparent connection to Costello by confirming through DMV records that the truck was registered to him.

The caller, who phoned on the afternoon following the high school burglary, said he had "just seen Costello and the property" and that Costello was planning to move the property sometime that evening or the next morning. The information was fresh and from personal observation, according to the caller, and the circumstances of the very recent theft plus the wealth of details gave reason to believe it.

Finally, Smith's report of seeing a man (presumably Costello) loading what appeared to be a concealed typewriter onto the truck for apparent transportation elsewhere frosted the cake. Such otherwise innocent-looking activity became suspicious in the context of the caller's tip. It was twilight during the loading, the truck was backed up to the open garage, the "typewriter" object was covered and apparently being hidden from view, and the caller had said that the stolen equipment (which Olivares knew included typewriters and other keyboard components) would be moved that night or the next morning.

The affidavit clearly supported probable cause when properly corrected and retested. The superior court erroneously ordered the fruits of the search suppressed.

## DISPOSITION

The judgment of dismissal is reversed. The superior court is directed to vacate its order suppressing the evidence obtained as a result of the warrant search.

Rouse, J., concurred.

**KLINE, P. J.**—I respectfully dissent.

The majority gives lip service but does not genuinely adhere to the applicable standard of review. Indulging all presumptions in favor of the trial court's findings, they must be upheld if supported by substantial evidence. Applying the standard properly, it seems to me inescapable that the trial court's finding of reckless disregard for the truth as to all three misrepresentations in the affidavit is supported by substantial evidence and that, when redacted to reflect the true facts, the affidavit does not establish probable cause for issuance of the search warrant.[1]

The trial court found that Olivares acted recklessly in stating that three men, rather than one, were loading the truck, that "unk. type equipment" was being loaded into the truck, and that the garage light was out but the subjects were using a flashlight. As the majority concedes, the recklessness finding as to the statement regarding "three males" is supported by substantial evidence, as Detective Smith had expressly reported to Olivares that *one* man was loading the truck. The majority then goes on to conclude that although "the existence of one deliberate misstatement in an affidavit lends some weight to the idea that other misstatements might have been made with the same state of mind" (maj. opn., p. 443) that inference does not render the overall evidence substantial in this case.

The trial court viewed it otherwise: "[T]he court finds there is so much— well, that there were not three males, that the garage light was not out; the subjects weren't using a flashlight; that unknown-type equipment into the car, that that's not what was stated by the officer that was surveilling. He said that it looked like a typewriter, so it was not unknown. And it was singular and not plural. And *when put together with the three males loading it,* the court gets the impression that it's numerous items, and not just a singular object . . . ." (Italics added.) The court also observed: "[*L*]*et's take the whole paragraph.* What about the garage light was out and the subjects were using a flashlight? Now, to me, when I look at that sentence, I would say, " 'Aha. Garage light out. Using flashlight. Obviously done in a surreptitious manner; obviously three men carrying all of this equipment [out] of the garage don't want to be seen. What is going on? Aha.' " (Italics added.)

The trial court found that the misrepresentations in the affidavit created the scenario of a group of thieves surreptitiously hauling away a truckload of office equipment, just as the informant had predicted, instead of revealing

---

[1] I agree with the majority that the trial court should have corrected the affidavit to reflect the true facts known to the affiant rather than striking the paragraph in question in its entirety.

the more pedestrian truth: an individual openly loading a truck with branches and other debris, into which he also tossed a single blanketed object consistent with the shape of a typewriter. The trial court implicitly found that the sinister picture painted by Olivares's handwritten paragraph so inexcusably distorted the truth that if he did not misstate the facts intentionally he at least did so recklessly. Viewing the evidence in the light most favorable to the respondents and presuming in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence, as an appellate court must, I conclude that the trial court's determination as to all three misrepresentations in the affidavit is clearly supported by substantial evidence. My colleagues' contrary conclusion is based on a mischaracterization of the record and a misreading of the law.

The majority states that the mention of "unk. type equipment" "was absolutely correct as far as it went," and asserts that "[t]he further problem that the word 'equipment' might connote more than one piece of equipment shows negligence at most." (Maj. opn., p. 442.) Given the evidence of the actual report made to Olivares by Smith and the other misstatements in the affidavit, the majority is simply improperly substituting its judgment and usurping the fact-finding function of the trial court. As to the statement regarding use of a flashlight, the majority concludes: "On this record we are left to speculate, first, who conveyed the faulty information, and second, whether miscommunications by either or both of the officers might have been innocent or negligent, rather than reckless." (Maj. opn., p. 442.) Smith testified that the porch light, garage light and a back light were on during the loading of the truck, and that the man loading the truck did not use a flashlight or appear to be "trying to keep something from view of anybody that might be passing in the street." Smith also testified generally that he advised Olivares of his observations at the stakeout. A fair inference can be drawn from this evidence that either Smith correctly reported his observations to Olivares and Olivares recklessly disregarded the truth, or Smith recklessly disregarded the truth in his report to Olivares. Either inference is sufficient. Police cannot "insulate one officer's deliberate misstatement merely by relaying it through an officer-affiant personally ignorant of its falsity." (*Franks* v. *Delaware* (1978) 438 U.S. 154, 163, fn. 6 [57 L.Ed.2d 667, 677, 98 S.Ct. 2674]; see also *Rugendorf* v. *United States* (1964) 376 U.S. 528, 532-533 [11 L.Ed.2d 887, 891, 84 S.Ct. 825].)

The question before us is simply whether, when corrected to reflect the true information known to the police, the affidavit establishes probable cause for the issuance of the search warrant. The majority ostensibly does not decide whether this court should undertake a true independent review of the affidavit or defer to the issuing magistrate in determining whether the affidavit supports probable cause. My colleagues strongly suggest, however,

that this court should in fact defer to the magistrate's decision to issue the warrant. I cannot agree.

Settled principles render it clear that in the circumstances presented by this case the appellate court must make a de novo determination whether probable cause exists without deference to either the conclusion of the superior court or of the magistrate. The *Franks* court stated that in the event reckless disregard is established and "with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking *on the face of the affidavit.*" (*Franks* v. *Delaware, supra,* 438 U.S. 154, 156 [57 L.Ed.2d 667, 672], italics added; see *United States* v. *Rubio* (9th Cir. 1983) 727 F.2d 786, 795 ["facts upon which the magistrate bases his probable cause determination must appear within the four corners of the warrant affidavit"]; accord, *United States* v. *Martinez* (9th Cir. 1978) 588 F.2d 1227, 1234; *United States* v. *Anderson* (9th Cir. 1971) 453 F.2d 174, 175.) The sufficiency of the remaining contents of the affidavit must be independently assessed by this court.

In *U.S.* v. *Grandstaff* (9th Cir. 1987) 813 F.2d 1353, the Ninth Circuit held that the appellate court was required to make an independent determination of probable cause based upon a search warrant affidavit which had been purged of information obtained through illegal entry of the defendant's hotel room. The court there stated: "We are in as good a position as was the district court to assess the legal sufficiency of the redacted affidavit. [Citations.] . . . Hence de novo review of the district court's decision is appropriate." (*Id.,* at p. 1355.) In this case, we are actually in a better position to assess the sufficiency of the affidavit than was the superior court (which ignored the last paragraph in its entirety) or the magistrate (who considered the last paragraph with the false statements included).

The majority states that it "makes no sense" to defer to the superior court's conclusion here because it assessed probable cause "based on the erroneous premise that the entire last paragraph of the affidavit had to be ignored." (Maj. opn., p. 444.) I agree. It would be equally nonsensical, however, to defer to the magistrate's determination since the magistrate's conclusion was based upon the erroneous assumption that the affidavit contained no statements made in reckless disregard of the truth. The majority's view that deference should be given to the magistrate's decision to issue the warrant is predicated upon the assertion in *Grandstaff* that the question is whether the affidavit "still affords the magistrate a *substantial basis* for concluding that a search would uncover evidence of wrongdoing" (813 F.2d 1353, 1355, italics added) and the statement in *Franks* that the purpose of

retesting is to determine whether the affidavit contains "support for a finding" of probable cause. (438 U.S. 154, 172 [57 L.Ed.2d 667, 682].) Common sense dictates that these passages cannot have the meaning the majority ascribes to them. Otherwise, a presumption is created that the magistrate would issue a warrant regardless of corrections in the affidavit supporting the application for the warrant. There is no support in logic or in the law for such a presumption. A de novo appellate assessment of probable cause without deference to any previous determination is clearly appropriate.

When the corrected affidavit is tested under the "totality of the circumstances" analysis mandated by *Illinois* v. *Gates* (1983) 462 U.S. 213 [76 L.Ed.2d 527, 103 S.Ct. 2317], it is manifestly insufficient to establish probable cause.

The police relied upon the tip of an anonymous informant. As the majority concedes, information from an untested informant will not establish probable cause unless "corroborated in essential respects by other facts, sources or circumstances." (*People* v. *Fein* (1971) 4 Cal.3d 747, 752 [94 Cal.Rptr. 607, 484 P.2d 583].) The majority states that "there was abundant detail in the December 12 caller's tip, and Olivares was able to corroborate most of it." (Maj. opn., p. 447.) An analysis of the affidavit, however, demonstrates that the corroboration was almost entirely of the type of "pedestrian facts" to which the courts deservedly attach little if any significance. (See *Higgason* v. *Superior Court* (1985) 170 Cal.App.3d 929, 940 [216 Cal.Rptr. 817].)

Olivares was able to verify Costello's name, his place of residence and the fact that there was an outbuilding at the rear of the property. The majority apparently views as corroboration the fact that the informant stated Costello could bypass an alarm system because he was an experienced former employee of an alarm company. The informant, however, only mentioned that fact after Olivares brought up the matter of the alarms being bypassed. Furthermore, Olivares was unable to verify that Costello had worked for an alarm company, a fact that would have provided some meaningful corroboration. The police were able to verify only that Costello had a sister enrolled in a computer class at a high school from which computers had recently been stolen, which is not particularly incriminating information in view of the fact that high school computer classes are commonplace.

The majority also views as corroboration the facts that Olivares had received an earlier anonymous tip stating that the informant had seen a large amount of computer equipment at Costello's house and that Olivares knew that similar anonymous information had been received by the narcot-

ics unit. The affidavit discloses that the only information Olivares mentioned as being received by narcotics officers was that Costello worked at Santa Rosa Luggage Company, an extremely innocent fact in the context of this case which, as it turns out, Olivares could not verify. More significantly, however, "it is impossible to show different pieces of anonymous information emanated from *independent* sources and are *truly* corroborative of one another." (*Higgason* v. *Superior Court, supra,* 170 Cal.App.3d 929, 938, italics in original.) " ' "[T]he quantification of the information does not necessarily improve its quality; the information does not rise above its doubtful source because there is more of it." ' " (*Ibid.,* citing *People* v. *Fein, supra,* 4 Cal.3d 747, 753.)

It is true that the informant knew the approximate dates of the thefts, that computer equipment had been taken and that an implement which might have been a pipe wrench had been used in connection with entry. These, however, are historical facts which could have been learned by anyone in the community and do not themselves in any way implicate respondents in the criminal activity.

Finally, the majority asserts that Smith's surveillance on December 12 added much corroboration and that his "report of seeing a man (presumably Costello) loading what appeared to be a concealed typewriter onto the truck for apparent transportation elsewhere frosted the cake." (Maj. opn., p. 448.) Smith gave Olivares the license number and description of the truck and Olivares confirmed through DMV records that it was registered to Costello, hardly a startling piece of information considering that the vehicle was parked on Costello's property. The majority observes that it was "twilight" during the loading, somewhat ironically attaching significance to this after stating previously in the opinion: "Even if we could sustain a recklessness finding, it would have had no significant impact on the magistrate to know that a garage light rather than a flashlight was used." (Maj. opn., pp. 442-443.) I cannot agree with the majority that "[s]uch otherwise innocent-looking activity [observed by Smith] became suspicious in the context of the caller's tip." (Maj. opn., p. 448.) An individual openly loading a truck full of branches and debris plus one covered item consistent with the shape of a typewriter is scant corroboration for the anonymous tip that Costello was storing and about to move computer equipment worth $35,000. Thus, when properly analyzed, the informer's tip is corroborated only by innocent rather than incriminating facts or by easily obtained historical information. Certainly Costello's name and the location of his residence are insignificant. That his sister attended a computer class, obviously not an uncommon occurrence, is no indication of his involvement in criminal activity, even considering the robbery of computers from the school. The knowledge of details of the thefts provided no connection to Costello. When corrected in

light of the *Franks* hearing, the affidavit does not through Smith's observations or otherwise provide corroboration for the anonymous tip. In short, the affidavit merely reported the anonymous tip uncorroborated in any meaningful way. "There are few principles of human affairs more self-evident than this: The unverified story of an untested informer is of no more moment than a fairy tale on the lips of a child, and the same tale from an anonymous tattler is worth much, much less." (*Higgason* v. *Superior Court, supra,* 170 Cal.App.3d 929, 946, 952 (conc. opn. of Crosby, J.), original italics omitted.)

For the foregoing reasons, I would affirm the judgment.

Respondent's petitions for review by the Supreme Court were denied December 22, 1988. Broussard, J., was of the opinion that the petitions should be granted.