Filed 6/12/26

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>LAWRENCE HAYES, JR.<br><br>      Defendant and Appellant. | A173642<br><br>(Solano County Super. Ct.<br>No. FCR363017) |

With an arrest warrant in hand, a Special Weapons and Tactics (SWAT) team held a perimeter around the apartment of defendant Lawrence Hayes (defendant). The team used a public announcement system to order him to surrender. After several hours, the team deployed a drone, a robot, and a chemical gas irritant into the apartment, ultimately causing defendant to come out. Following the team's instructions, he walked 20 yards from his apartment to an arresting officer. Some time after the arrest, defendant made incriminating statements during recorded jailhouse phone calls.

Contending that the police had included false statements with reckless disregard for the truth in the warrant affidavit, defendant moved to traverse the warrant and to suppress the recordings of the jailhouse calls as the fruit of the poisonous tree. The court traversed the warrant based on the false statements but denied the motion to suppress because it concluded that the

---

* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II of the Discussion.

police had probable cause to make a warrantless arrest and had not entered defendant's home to do so.  Defendant subsequently pled no contest to shooting at an inhabited dwelling, also admitting a prior strike and a firearm allegation.  The court imposed a sentence of 10 years.

On appeal, defendant challenges the denial of his motion to suppress. First, he contends that the police lacked probable cause to arrest him because the only information the arresting officers possessed was the same information the trial court had found insufficient to establish probable cause for the arrest warrant once the false statements were excised from the affidavit.  Second, he contends that, even if the police had probable cause for a warrantless arrest outside the home, the arrest still violated the Fourth Amendment because the police's use of coercive tactics to force him out were equivalent to an in-home arrest.  The Attorney General counters that the trial court erred by traversing the arrest warrant in the first place—both because the police had not made false statement with reckless disregard of the truth, and because the remainder of the affidavit, with those statements excised, still provided sufficient cause for a warrant—and that, in any event, the arrest was proper without a warrant, as the trial court ruled.

We will affirm the judgment because we agree with the Attorney General that the trial court incorrectly traversed the arrest warrant because the warrant affidavit still set forth sufficient facts to establish probable cause even after the false statements were excised.  Therefore the police lawfully could arrest defendant in his home or by forcing him from it, as they did.

## BACKGROUND

### Verbal Altercation and Shooting

In an early evening in April 2022, Eden Hayes[1] (husband), his wife Morva Jimerson (wife), and their next-door neighbor were talking in front of their homes. Defendant, who was unknown to them, approached on the sidewalk and started an aggressive verbal altercation with husband. He came on husband and wife's property, moving in the direction of the garage, where husband was standing and wife was retreating. Husband entered the garage, grabbed a firearm, and then stepped back out holding it at his side. Defendant ran away, heading west.

A few hours later, husband and wife were watching TV in their garage, when they heard something like rocks being thrown against the wall. Anxious from the earlier altercation, wife ran inside, gathered their kids, and hid behind a sofa. Husband grabbed a firearm and opened the garage door. He heard what he presumed to be gunshots, and he saw muzzle flashes. He could not see the shooter clearly or identify the number of people outside. He fired back, retreated into the house, and went upstairs with his family. Wife called 911 to report the shooting and the earlier verbal altercation. Other people had also called 911 to report the shooting.

### Police Investigation

When the police arrived, they secured the house , gathered evidence, canvassed the neighborhood for witnesses, and talked to husband and wife. Wife told the police that she had seen the man from the earlier verbal altercation but that she had not seen anything during the shooting because she immediately had gone inside. She said that she would be able to identify the man if she saw him again. Husband also told the police about the events.

---

[1] Defendant and Eden Hayes coincidentally share the same last name.

3

Regarding the shooting, he said, "I could see a body. I couldn't see him, but I could see a body moving around, and I could see the muzzle of his [gun] flashing." When asked if it was the same person from earlier, he said, "I would say yes. I didn't see him, but I am assuming."

Two witnesses had been out walking their dog when they heard gunfire. One told an officer that, about twenty minutes after the gunfire, they had seen two men in an apartment complex half a block west of husband and wife's house. The men went from the apartments to a parking lot, one man limping while the other helped him. One witness said that the one who was limping was "like trying to run but he was . . ." and then she demonstrated hopping on one foot. The men changed clothes at a vehicle, put their clothes in it, and then made their way to one of the complex's apartments, which the witnesses identified to the officer. Officers approached that apartment and saw two men through a half-open door, which one of them quickly shut when he saw the officers.

The police learned that "Lawrence Hayes" was associated with the apartment. They ran his name through their database, retrieving a photograph and information about him. An officer showed the photograph to wife, who identified him.

## Warrants

Detective Christopher Beck prepared an application for a search warrant. Communicating remotely with officers on the scene, he obtained information from which he drafted an affidavit in support the application. His affidavit described the events at husband and wife's house and the subsequent investigation. A magistrate reviewed the application and signed a search warrant and an arrest warrant at about 2:30 a.m. The arrest

warrant was based on the same affidavit that Detective Beck had prepared for the search warrant.

## Arrest and Search

Officers established a perimeter around defendant's apartment, and they directed announcements at the unit through a public announcement system. The content was along the lines of, " 'Fairfield Police Department. We know you are inside. Come out with your hands up.' " At about 11:30 p.m., one of the two men seen by the dog-walking witnesses stepped out and the police detained him. Defendant did not come out.

Around the same time the magistrate was issuing the warrants, a SWAT team replaced the officers who had established the perimeter. The SWAT team held the perimeter for another few hours, continuing to make announcements over the public announcement system to the effect of, " 'The occupants of Apartment 152, we have a search warrant. You're required to come out of the house' " and " 'Lawrence Hayes, we have a warrant for your arrest. You are ordered out of the house.' " The team also used a siren.

At some point a little before 5:30 a.m., the SWAT team escalated their tactics. They deployed a "flash-bang," which is a light-and-sound diversionary device, near the apartment's front door; broke several of the apartment's rear windows and deployed a chemical gas irritant through them; sent in a drone; and sent a robot through the front door.[2] Shortly after the police deployed the gas irritant, defendant came out of the apartment. Following police instructions, he walked about 20 yards to where an officer placed him in handcuffs. When the police searched his apartment, they

_____

[2] The record does not indicate how the front door became passable for the robot.

5

found an AK-47 style rifle (which they suspected had been used in the shooting), ammunition, and suspected drug-related contraband.

## Search Warrant Traversal

After his arrest, defendant moved the trial court to traverse the search warrant and exclude evidence found in the apartment. In his moving papers, defendant challenged multiple statements in Detective Beck's affidavit as false or misleading. Based on defendant's preliminary showing, the trial court held a *Franks* hearing to allow the parties to present evidence. (See *Franks v. Delaware* (1978) 438 U.S. 154, 155–156 (*Franks*).) Detective Beck testified about how he had gathered information and prepared the affidavit.

The trial court found that the following affidavit statements were false: husband saw the defendant shooting a firearm at him; a witness saw two Black men run across the street (to the apartment complex); and wife saw defendant shooting a firearm. The court further concluded that the statements were made with reckless disregard for the truth.

After the trial court excised the statements, the probable cause section of the affidavit still provided the following information. At about 9:30 p.m., police dispatch received several calls regarding a shooting that had occurred in the area of husband and wife's house. While police were enroute, dispatch received a call from wife, who said she was inside her home when it was shot at, and she provided the address. When officers arrived, wife told them that earlier in the day husband had been in a verbal dispute outside their home with a male subject, later identified as defendant. About an hour after the argument,[3] husband heard a loud bang on his garage door. "[He] opened the

---

[3] There is conflicting evidence in the record about what time the argument occurred—there is some indication it might have been two or more hours before the shooting—but defendant did not contend that the affidavit

6

garage door, ~~and he saw [defendant] shooting a firearm at him.~~[4] [He] picked up his own firearm, and fired back as he retreated into his house." Officers located numerous bullet holes in the house. A witness advised officers "that ~~right after the shooting he saw two black males run across the street to 2751 Peppertree Dr, Laurel Creek Apartments~~."[5] The witness saw one male who was assisting another male who was limping. "The male suspects were observed throwing something inside a vehicle parked in the parking lot of [the apartment complex located half a block away], and they ~~ran~~[6] toward [an] apartment [ ]." A records check of the apartment revealed that defendant and a second uninvolved person were on the lease and had multiple police contacts at the residence, as recently as December 2021. Officers showed wife a photograph of defendant and "she confirmed he was the subject who got into a verbal dispute with her husband ~~and shot into their residence~~." Defendant "has an extensive criminal history, and is a convicted felon. He has prior convictions involving firearms."

The People argued that the affidavit continued to provide sufficient evidence to establish probable cause to issue the search warrant. The trial court disagreed. Based on its findings and conclusions, the court granted defendant's motion to traverse the search warrant, and it excluded the

---

was inaccurate insofar as it described the shooting as occurring an hour afterwards.

[4] We use strikethrough text in this paragraph to identify words in the affidavit that the trial court excised.

[5] From the hearing transcript, it is not clear exactly how much of this sentence the trial court intended to excise.

[6] The trial court did not expressly excise the word "ran," but during its discussion of the false statements it explained that "ran" was not an appropriate description for a limping person and that the word mattered because it suggested fleeing.

evidence discovered during the search of defendant's apartment after his arrest.

## Arrest Warrant Traversal

The trial court later held a preliminary examination during which the prosecution introduced recordings of incriminating phone calls made by defendant while he was in jail following his arrest. On the same grounds that he had successfully moved to traverse the search warrant, defendant then moved to traverse the arrest warrant and to suppress the recordings as fruit of the poisonous tree.

At the hearing on the motion, the trial court recounted that the People previously had agreed that the motion was in relevant part the same as the motion to traverse the search warrant: "At the last hearing, we kind of started discussing this a little bit, and the order—the motion to traverse the arrest warrant is, in essence, the same motion that was filed as to motion to traverse the search warrant that the Court granted."[7] Speaking to the deputy district attorney, the court continued: "In the motion to traverse the arrest warrant, if I recall correctly—and correct me if I'm wrong . . . . I believe you said that it's your position that it is basically the situation where it is the same facts as the motion to traverse the search warrant and you were not going to contest—maybe you didn't use those words, but you were not going to contest that part of the motion is—was your position . . . ." The deputy district attorney agreed.

The trial court granted the motion to traverse the arrest warrant, reiterating its earlier finding that the supporting affidavit included false statements made with reckless disregard for the truth. Implicitly, the court

---

[7] The record on appeal does not contain a transcript of the earlier hearing to which the trial court refers.

again found that the reformed affidavit did not justify a finding of probable cause.

The trial court proceeded to hear evidence about whether the police nevertheless had probable cause for the arrest they made outside of defendant's apartment. Several officers testified about the investigation and subsequent arrest. At the close of evidence and argument, the trial court determined that the police had probable cause to suspect that defendant was the shooter. The court based its conclusion on evidence that (1) officers were investigating a shooting, (2) wife had identified defendant as the person involved in the verbal altercation, (3) husband believed the shooter was the same person, (4) the shooting happened at the same residence as the verbal altercation, and (5) the shooting happened on the same day, only a few hours later. The trial court concluded that the arrest was lawful, based on probable cause alone, because the police did not arrest defendant in his home. Accordingly, the court did not suppress the jailhouse phone call recordings.

## DISCUSSION

"On appeal from the denial of a motion to suppress, we defer to the trial court's factual findings if supported by substantial evidence but independently apply constitutional principles to those findings." (*People v. Perez* (2026) 119 Cal.App.5th 373, 376 (*Perez*).)

## I.

As a threshold matter, we reject the Attorney General's argument that the trial court properly treated defendant's arrest as one made outside the home. "[W]hen it comes to the Fourth Amendment, the home is first among equals. At the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" (*Florida v. Jardines* (2013) 569 U.S. 1, 6.) To enter a suspect's

9

home for purposes of arrest, police need either a warrant or probable cause *and* exigent circumstances. (*Payton v. New York* (1980) 445 U.S. 573, 590 (*Payton*).) No one has suggested that there were exigent circumstances here.

In this case, it makes no difference that the officers never personally crossed the threshold and instead handcuffed defendant outside. He was still inside his apartment "when he submitted to [police] authority and complied with their orders . . . to come out." (*Perez, supra,* 119 Cal.App.5th at p. 377 [arrest effected in home when police with drawn guns ordered defendant out]; see *People v. Lujano* (2014) 229 Cal.App.4th 175, 187 [" '[I]t is the location of the arrested person, and not the arresting agents, that determines whether an arrest occurs within a home' "].) Defendant exited his apartment only after police had surrounded it for hours and broadcast orders for him to come out with his hands up, and the SWAT team had deployed a "flash bang" near the apartment's front door, broken several rear windows and delivered a chemical gas irritant through them, and sent a robot and drone inside. This was not a case of someone voluntarily stepping outside to talk at the invitation of the police. (Cf. *People v. Tillery* (1979) 99 Cal.App.3d 975, 979–980.)

The Attorney General cites *People v. Trudell* (1985) 173 Cal.App.3d 1221 (*Trudell*), in which the defendant exited his house after the police knocked and ordered him to come out and then used a public announcement system to repeat the order. (*Id.* at p. 1228.) By the time he emerged, five officers had arrived at the scene and some had drawn their weapons. (*Ibid.*) A divided panel of this court held that the warrantless arrest that followed was lawful based on probable cause because it occurred outside the residence. (*Ibid.*) The case at hand is distinguishable because the police here used

greater coercion, but even putting that difference aside, we believe the contrary analysis in *Perez* and *Lujano* is correct.

We are mindful that, "[a]bsent a compelling reason, the Courts of Appeal are normally loath to overrule prior decisions from another panel of . . . the same division." (*Estate of Sapp* (2019) 36 Cal.App.5th 86, 109, fn. 9.) Nonetheless, a case from our own division does not bind us, and we need not follow it when we conclude it was wrongly decided. (*Tourgeman v. Nelson & Kennard* (2014) 222 Cal.App.4th 1447, 1456, fn. 7; see *Saucedo v. Mercury Savings & Loan Ass'n.* (1980) 111 Cal.App.3d 309, 310.)

The *Trudell* majority observed that the prohibition on warrantless arrests inside the home protects "the sanctity of the premises" or " 'the right to privacy in a private dwelling.' " (*Trudell, supra*, 173 Cal.App.3d at p. 1229, citing *Payton, supra*, 445 U.S. at p. 590 and *People v. Ramey* (1976) 16 Cal.3d 263, 274.) It reasoned that those principles are "inapplicable" when the police do not enter the defendant's home. (*Trudell*, at p. 1229.) The dissent responded, however, that *Payton* and *Ramey* "mean very little" if they do not reach "bullhorned orders delivered at gunpoint [to] force a suspect to leave his residence." (*Id.* at pp. 1232–1233, dis. opn. of Poché, J.) We note that other courts have made a similar point. (See, e.g., *U.S. v. Allen* (2d Cir. 2016) 813 F.3d 76, 85 ["If the rule of *Payton,* and the fundamental Fourth Amendment protection of the home on which it is based, are to retain their vitality, the rule must turn on the location of the defendant, not the officers, at the time of the arrest"]; *U.S. v. Morgan* (6th Cir. 1984) 743 F.2d 1158, 1166 [arrest of a person who complied with officers' bullhorned orders to come out was effectively made inside the home, noting that "[a] contrary rule would undermine the constitutional precepts emphasized in *Payton*"]; *U.S. v. Maez* (10th Cir. 1989) 872 F.2d 1444, 1451 ["the important point is that in cases of

11

physical intrusion, *or coercion to leave the home, as in this case*, the privacy of the home is effectively invaded," italics added]; *People v. Shaw*, ___ N.E.3d ___, 2026 N.Y. Lexis 130 (Feb. 19, 2026), at *8 ["When officers subject someone to a display of authority that induces them to exit the home under coercion, the sanctity of the home has been invaded to the same extent as if the officers had physically entered"].)

The *Trudell* majority also analogized to cases in which the police "talked" or "tricked" the defendant into leaving the residence. (*Trudell, supra*, 173 Cal.App.3d at pp. 1229–1230.) The dissent pointed out, correctly in our view, that "[s]uch a situation is different in kind from forcing a person at gunpoint to leave his residence." (*Id.* at p. 1233, dis. opn. of Poché, J.; see, e.g., *U.S. v. Thomas* (6th Cir. 2005) 430 F.3d 274, 277–278 [distinguishing "knock and talk" encounters from those in which the police use "overbearing tactics that essentially force the individual out of the home"]; *U.S. v. Nora* (9th Cir. 2014) 765 F.3d 1049, 1054 [ordering a suspect to come out at gunpoint "constitutes an in-home arrest under *Payton*"].)[8] Although *Trudell* was decided more than 40 years ago, *Perez* noted that "[n]o published California case has ever endorsed [its] analysis." (*Perez, supra*,

_____

[8] Although we have no occasion to address the issue, we also note that the proposition on which the *Trudell* majority relied—that police without a warrant may trick someone into leaving their residence—was later called into question by *People v. Reyes* (2000) 83 Cal.App.4th 7, which reasoned that "[a] deception used to gain entry into a home and a ruse that lures a suspect out of a residence is a distinction without much difference." (*Id.* at p. 12.) The court invalidated the search because the police "lured [the defendant] outside with a trick unrelated to criminal activity, one that undermined the voluntariness of the consent. Put another way, the net used would have scooped up the innocent as well as the guilty; and this particular way of fishing for criminals is inconsistent with the state's obligation to respect the privacy of its citizens." (*Id.* at p. 13.)

119 Cal.App.5th at p. 378.)  We agree with *Perez*'s criticisms of *Trudell* and conclude that it should not be followed.

Finally, we disagree with the Attorney General that *California v. Hodari D.* (1991) 499 U.S. 621 compels a conclusion that the police in this case arrested defendant outside his home.  There, the Court held that an arrest requires either physical force (described as touching a person with the purpose of holding them in custody) *or* a suspect's submission to an assertion of authority.  (*Id.* at pp. 624–626.)  It appears to us that defendant submitted to the police assertion of authority while he was inside the apartment by following police orders to exit and then walking to the arresting officer.  (See *Perez, supra*, 119 Cal.App.5th at p. 377 [applying *Hodari D.*]; *Sharrar v. Felsing* (3d Cir. 1997) 128 F.3d 810, 819 [same].)

## II.

Although the arrest must be treated as one made inside defendant's home, it was still lawful if the trial court erred by concluding that the warrant affidavit failed to establish probable cause once the false statements were excised.  We requested supplemental briefing on that issue because the parties' briefs had focused on the different, although here closely related, question of whether there was probable cause for a warrantless arrest a few hours after the magistrate had issued the warrant.  Having reviewed the supplemental briefs, we think the Attorney General has the better of the argument.

## A.

Before reaching that issue, we address defendant's contention that the People forfeited any argument that the trial court erred in traversing the arrest warrant.  Specifically, defendant asserts that the People did not object to the trial court applying the conclusions from its earlier search warrant

13

ruling when it addressed the motion regarding the arrest warrant. The forfeiture rule does not apply, however, when an objection would have been futile. (See *People v. Zaheer* (2020) 54 Cal.App.5th 326, 337, fn. 9.) Here, the People had specifically argued against the search warrant traversal on the grounds both that the police had not acted with reckless disregard of the truth and that probable cause would continue to support the warrant were the contested statements removed. The trial court rejected those arguments, finding that the police had, in fact, acted with reckless disregard and that the excised affidavit was not sufficient to support the warrant. An objection at the hearing on the arrest warrant—as to the same issues and based on the same facts—would have served no purpose. In their opposition, the People expressly wrote that, while they did not "concede" the motion to traverse the arrest warrant, they would not "contest" it either because the same affidavit supported both warrants, so the analysis would be the same and the court would necessarily reach the same result. There was no forfeiture or waiver by this acknowledgment. (See *Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 212–213 [" ' "An attorney who submits to the authority of an erroneous, adverse ruling after making appropriate objections or motions, does not waive the error in the ruling by proceeding in accordance therewith . . ."].)

**B.**

In a *Franks* hearing, the trial court determines whether a challenged warrant affidavit includes false statements made in knowing or reckless disregard of the truth. (*Franks, supra*, 438 U.S. at pp. 155–156.) If so, the trial court must excise the statements and determine whether the affidavit's remaining statements are sufficient to justify a finding of probable cause. (*Id.* at pp. 155–156, 171–172; *People v. Miles* (2020) 9 Cal.5th 513, 576–577.)

14

If the remaining statements suffice, the trial court may not traverse the warrant. (See *Franks,* at pp. 171–172; *People v. Bradford* (1997) 15 Cal.4th 1229, 1297 [defendant bears burden of demonstrating that untrue statements are material to determination of probable cause]; *People v. Thuss* (2003) 107 Cal.App.4th 221, 235 [warrant may be upset only if affidavit fails to set forth competent evidence supporting finding of probable cause].)

Probable cause supports an arrest warrant when the circumstances described in the affidavit provide a substantial basis from which a magistrate could reasonably conclude that there is a fair probability that the suspect committed a crime. (*People v. Richardson* (2008) 43 Cal.4th 959, 989; see *Illinois v. Gates* (1983) 462 U.S. 213, 235.) A finding of probable cause " 'requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.' " (*District of Columbia v. Wesby* (2018) 583 U.S. 48, 57.) It is not a high bar. (*Kayley v. U.S.* (2014) 571 U.S. 320, 338.) We determine de novo whether an excised affidavit meets this standard. (*People v. Costello* (1988) 204 Cal.App.3d 431, 451; see *People v. Tousant* (2021) 64 Cal.App.5th 804, 818 [addressing standard of review in context of statements excised from affidavit because of illegal conduct].)

Here, the affidavit continued to establish probable cause after the trial court removed the false statements. The excised affidavit still included the following information: police were called to the scene to investigate a shooting; husband had been involved in a verbal altercation with a man outside of his and wife's house; an hour later, husband heard a bang on the garage door; he opened the garage door and returned fire; police found multiple bullet holes in the house; police located a suspect and learned his name and that he had an extensive criminal history that included convictions involving firearms; and, from a photograph, wife identified the suspect as the

15

man from the earlier verbal altercation. These facts suffice to cause a reasonable person to conclude that there was a fair probability that defendant was the shooter.

These same facts caused the trial court to conclude that the police had probable cause to make a warrantless arrest of defendant. The only additional fact the trial court cited in making that ruling was that "[husband] believes it is the same person that was involved in the earlier incident." But since husband did not see the shooter, his belief rested on the same facts recounted in the excised affidavit and was of no independent significance. As the trial court reasoned, "when you think of the totality of the circumstances," there is a "connection between the first incident and the second incident" because they occurred in the same place just hours apart. Wife's identification of defendant as the man from the first incident thus strongly supported an inference that he was also the shooter from the second incident.

Because the excised affidavit continued to establish probable cause to arrest defendant, the trial court erred by traversing the warrant. (See *People v. Thuss, supra*, 107 Cal.App.4th at p. 235.)[9] The warrant was valid when the police arrested defendant, and therefore the arrest was lawful even though it was effectively made in his home. (See Penal Code, § 844; *Payton, supra*, 445 U.S. at pp. 589–590.) For this reason, the result of the hearing at issue—the denial of defendant's motion to suppress—was correct.

---

[9] In light of this conclusion, we need not decide whether sufficient evidence supported the trial court's traversal finding of reckless disregard for the truth.

## DISPOSITION

The judgment is affirmed.

GOLDMAN, J.

WE CONCUR:

BROWN, P. J.
STREETER, J.

| | |
|---|---|
| Trial Court: | Solano County Superior Court |
| Trial Judge: | Honorable Wendy Getty |
| Counsel for Defendant and Appellant: | Richard L. Fitzer, under appointment by the Court of Appeal |
| Counsel for Plaintiff and Respondent: | Rob Bonta<br>Attorney General<br>Charles C. Ragland<br>Chief Assistant Attorney General<br>Jeffrey M. Laurence<br>Assistant Attorney General<br>Seth K. Schalit<br>Arthur P. Beever<br>Matthew J. Eitelberg<br>Deputy Attorneys General |